ORIGINAL

Ira P. Rothken, Esq. (Pro Hac Vice)
ROTHKEN LAW FIRM
1050 Northgate Drive, Ste. 520
San Rafael CA 94903
Tel: (415) 924-4250
Fax: (415) 924-2905



Gregory A. Piccionelli, Esq. (Pro Hac Vice)
Robert A. Sarno, Esq. (Pro Hac Vice)
PICCIONELLI & SARNO
1925 Century Park East 2350
Los Angeles CA 90067
Tel: (310) 553-3375
Fax: (310) 553-5190

Jerome Mooney, Esq. (Utah Bar No. 2303)
Mooney Law Firm
50 W. Broadway, #100
Salt Lake City UT 84101
Tel: (801) 364-6500
Fax: (801) 364-3406

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| FREE SPEECH COALITION, INC., A California Not-For-Profit Trade Association, On Its Own Behalf and On Behalf of Its Members, <br><br> Plaintiff, <br><br> vs. <br><br> THE STATE OF UTAH, a body politic; THE UTAH DEPARTMENT OF COMMERCE, a department in the executive branch of the State of Utah; THE DIVISION OF CONSUMER PROTECTION, an administrative agency in the Utah Department of Commerce; MARK SHURTLEFF in his official capacity as Utah Attorney General of the State of Utah; FRANCINE GIANI, in her official capacity as the Executive Director of the Utah Department of Commerce, and in her official capacity as the Director of the Division of Consumer Protection in the Utah Department of Commerce, <br><br> Defendants. | Case No. <br><br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br><br><br> Judge J. Thomas Greene <br> DECK TYPE: Civil <br> DATE STAMP: 11/17/2005 @ 09:35:08 <br> CASE NUMBER: 2:05CV00949 JTG |

Plaintiff Free Speech Coalition, Inc. ("Free Speech Coalition"), by and through undersigned counsel, alleges and complains against the above named defendants as follows:

## NATURE OF THE CASE

1.     This is a civil action for declaratory judgment and injunctive relief. Plaintiff, a trade association, seeks on behalf of itself and its members a declaration that Utah's Child Protection Registry Act, Utah Code Ann. § 13-39-101 *et seq.* (the "CPR Act") is pre-empted by Section 7707(b) of the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003, 15 U.S.C. § 7701 *et seq.* ("CAN-SPAM"), and violates various provisions of the United States Constitution and the Utah Constitution. Plaintiff further seeks a preliminary and permanent injunction enjoining the operation, effectiveness and enforcement of the CPR Act.

2.     Utah's CPR Act's purported purpose is to protect minors (i.e., Utah citizens under the age of eighteen) from receiving and viewing electronic mail ("email") messages which "advertise" products or services which cannot be lawfully sold to minors and/or contain material which is "harmful to minors" as that term is defined by Utah Code Ann. § 76-10-1201(4). While this purpose is laudable, the CPR Act is overbroad, creates more problems than it solves, potentially exposes minors to an increased risk of receiving unwanted and inappropriate email, unduly burdens and restricts the rights of plaintiff, its members and other legitimate business persons (collectively "e-marketers") who use the Internet as an effective tool of commercial expression, and creates the kind of unworkable "balkanization" of email regulation that the federal preemption provisions of CAN SPAM are designed to prohibit.

3.     Among other things, the CPR Act (a) creates a database of minor email addresses that might be illegally obtained and used by unscrupulous and irresponsible persons, including off-shore spammers and pedophiles who will not be deterred by any of its provisions, (b) fails to make a distinction between those email messages which are truly harmful to minors and

2

legitimate commercial email messages that do not actually harm their sensitivities or encourage

unlawful conduct, (c) imposes an undue burden on the most responsible e-marketers, i.e., those

who will actually attempt to conform their practices to the requirements of the CPR Act, (d)

makes it illegal for plaintiff and other e-marketers to engage in commercial activity that is

lawfully allowed for other more traditional marketers in the State of Utah, and (e) impermissibly

chills the free speech rights of plaintiff and others.

4.    The United States Congress has already determined that the global scope of the

Internet makes it impossible for the individual states to regulate email and other Internet

activities without imposing inconsistent and unfair burdens on interstate and foreign commerce,

and that the direct regulation of email should be left to the exclusive purview of the federal

government.

5.    The State of Utah does not have a valid interest in over-regulating plaintiff and

other e-marketers, and the broad, overarching scope of the CPR Act (a) legislates an area which

has been preempted by the CAN-SPAM Act, (b) impermissibly burdens interstate commerce, (c)

violates rights of free expression protected under the First and Fourteenth Amendments to the

United States Constitution and/or Article I, Section 15 of the Utah Constitution, and/or (d) treats

plaintiff and other e-marketers different than more traditional marketers under the law, in

violation of Article I, Section 24 of the Utah Constitution.

## PARTIES

6.    Plaintiff Free Speech Coalition is a trade association which was founded in 1991

and incorporated in the state of California. The mission of the Free Speech Coalition is to assist

its members in the exercise of their First Amendment rights and in the defense of those rights

against censorship. The Free Speech Coalition represents more than 3,000 member businesses

and individuals involved in the production, distribution, sale and presentation of non-obscene,

3

adult–oriented materials. Members of the Free Speech Coalition include filmmakers, producers,

distributors, wholesalers, retailers and Internet providers located throughout the United States.

The Free Speech Coalition and its members make use of bulk commercial email to advertise

their goods and services by sending non-fraudulent email messages addressed to recipients who

have affirmatively given their consent to receive such email under a "double opt-in" method of

consent, or its operational equivalent and The Free Speech Coalition and its members from time

to time have historically and would like to continue to send non-obscene, adult–oriented

materials through such permission based e-mail marketing but are chilled from doing so by the

Utah statute at issue in this case and further have a serious and reasonable apprehension and fear

of criminal liability –namely that unless plaintiff and its members pay the fees and comply with

the draconian provisions of the statute at issue they will be prosecuted criminally. By a "double

opt-in" method of consent is meant a method by which a recipient of bulk commercial email both

affirmatively consents, or "opts in" to receiving such email in the course of its dealings with the

sender, and then confirms such consent by responding to an email sent to the recipient and/or

clicking on a link contained in such an email. The Utah CPR Act requires that even double opt-in

email be subject to such CPR Act and that fees be paid by plaintiff and its members even for e-

mail addresses that are fully double opt-in and in full compliance with the Federal Can-Spam

Act.

       7.      The State of Utah (the "State"), through the Utah State Legislature (the

"Legislature"), enacted the CPR Act, which became effective on July 15, 2005. Unless

immediately enjoined, the State, through its Governor, Attorney General, Department of

Commerce and/or Division of Consumer Protection, will enforce the provisions of the CPR Act,

causing irreparable harm to plaintiff, its members and other e-marketers.

4

8.     The Department of Commerce (the "Department") is a department within the
executive branch of the State. Through its Division of Consumer Protection, the Department has
been granted the authority to promulgate rules under the CPR Act, and to enforce its provisions.
Unless immediately enjoined, the Department may take efforts to require the Division of
Consumer Protection to enforce the provisions of the CPR Act through the initiation of
administrative investigations, the issuance of cease and desist orders and/or the imposition of
administrative fines, thereby causing irreparable harm to plaintiff, its members and other e-
marketers.

9.     The Division of Consumer Protection is an administrative agency within the
Department (the "Division"). The Division has been granted the authority to promulgate rules
under the CPR Act, and has been instructed to enforce its provisions through administrative
investigations, cease and desist orders and/or administrative fines. If not immediately enjoined,
the Division may exercise its authority to administratively enforce the provisions of the CPR
Act, thereby causing irreparable harm to plaintiff, its members and other e-marketers.

10.    Mark Shurtleff is the Attorney General of the State of Utah and is sued in his
official capacity. Mr. Shurtleff is the chief legal officer of the State, and is charged with the duty
of representing its interests, including its interest in enforcing its statutes and sustaining the
validity of enactments of the State's legislative branch. If not immediately enjoined, Mr.
Shurtleff may take efforts to enforce the provisions of the CPR Act through civil lawsuits and/or
criminal prosecutions, thereby causing irreparable harm to plaintiff, its members and other e-
marketers.

11.    Francine Giani is the Executive Director of the Utah Department of Commerce,
and is also the Director of the Division of Consumer Protection in the Utah Department of
Commerce. She is sued in said official capacities. If not immediately enjoined, Ms. Giani may

5

take efforts to require the Utah Department of Commerce Division, and the Division of

Consumer Protection, as an agency of the Department, to enforce the provisions of the CPR Act

through the initiation of administrative investigations, the issuance of cease and desist orders

and/or the imposition of administrative fines, thereby causing irreparable harm to plaintiff, its

members and other e-marketers.

## JURISDICTION AND VENUE

12.    This case arises primarily under the United States Constitution and the laws of the

United States and presents federal questions over which this Court has original jurisdiction under

Article III of the United States Constitution and 28 U.S.C. § 1331.

13.    Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over any

related claims arising under the Constitution and laws of the State of Utah.

14.    Venue is proper in this district under 28 U.S.C. § 1391(b).

## GENERAL ALLEGATIONS

**A.    The Internet**

15.    The Internet is a decentralized, local medium of communication that links people,

institutions, corporations and governments around the world. It is a giant computer network that

interconnects innumerable smaller groups of linked computer networks and individual

computers, and through which text, images and sounds are transported and displayed.

16.    Although exact estimates are difficult due to its constant and rapid growth, the

Internet is currently believed to connect millions of users worldwide.

17.    The Internet is a unique, rapidly evolving medium of human communication and

commerce. By its very nature, the Internet does not have any borders. Thus, persons who speak

or do business over the Internet are able to make their communications, goods and services

available to computer users throughout the country and around the world.

6

18.    Given the broad reach of the Internet, it is virtually impossible for a local law or regulation to have a purely local effect.

**B.    How the Internet Works**

19.    In its most basic terms, the Internet works because individual computers/networks have the technological capacity to "link" or interact together in a way which allows the user of one computer/network to send information, in a variety of forms, from its own computer/network to the computer/network of another.

20.    In the United States, most people access the Internet through companies known as internet service providers ("ISPs"). Home Internet users are likely to contract on a monthly or annual basis with an ISP, and typically access that ISPs network over a "dial-up" telephone line, or a higher-speed connection such as a cable, "DSL", or wireless circuit. Some ISPs charge a monthly fee, but some provide their users with free or very low-cost internet access. National "commercial online services," such as MSN and America Online, serve as ISPs and provide subscribers with additional services, including access to email accounts and emailing software.

**C.    Email**

21.    Email is one of the simplest and perhaps most widely used methods of communication over the Internet.

22.    Email has become an increasingly attractive, inexpensive and effective means of communication. It is estimated that in the year 2005, approximately 11.5 Billion email messages are being sent in the United States each day, and approximately 26.1 Billion are being sent each day world-wide.

23.    An email address is a series of characters combined together in a unique format which identifies both the individual computer user and the particular computer network or "domain" to which that user links for purposes of obtaining and sharing information over the

Internet. By way of example, an individual computer user by the name of John Doe who maintains a contract with MSN as its ISP might have the email address jdoe@msn.com. The "jdoe" portion of the email address identifies the computer user (the "individual identifier"), whereas the "msn.com" portion of the email address identifies the ISP network or "domain" to which Mr. Doe links to obtain information over the Internet (the "domain identifier").

24.     The individual computer user can select any available combination of characters as his or her individual identifier, and there is typically no way to determine, from the email address alone, the computer user's legal identity (i.e. his or her legal name), address, physical location, state of residence, age, or other personal information. This anonymity is one of the features that makes email an increasingly attractive form of communication.

25.     To send an email message the sender uses its emailing software on his or her individual computer to compose an email message. Once the email message has been composed, the sender's individual computer transmits the email message to the network which the sender uses to access and share information over the Internet (the "sender's domain"). The sender's domain then uses the recipient's domain identifier to search the Internet and locate the network which the recipient uses to access and share information over the Internet (the "recipient's domain"). Once the recipient's domain is found, the sender's domain "links" to the recipient's domain and transmits the email message. The recipient's domain receives the email message and, using the individual identifier, locates the intended recipient of the email message. The recipient's domain then delivers the email message to the recipient's email account, typically a section of the recipient's domain which has been separately assigned to the individual recipient's email address, and which should be accessible only by the email account holder and/or those persons with knowledge of the recipient's password. The recipient uses his or her individual computer to link to the recipient's domain, and, using his or her password, accesses his or her

8

email account, where he or she can then open and view the email message. Through the wonders of modern technology, all of this occurs in a matter of seconds.

26.     Emails frequently pass through multiple computer networks, and travel across multiple transmission lines, in multiple states, before reaching the intended recipient. For example, an email sent by one Utah resident to another Utah resident may be routed through any number of computer servers located in states outside the State of Utah.

27.     Individual computer users can often access their email accounts and view their email messages from any computer, located anywhere in the world.

28.     There is typically no limit to the number of email accounts and/or email addresses an individual can open, and many persons hold more than one email account and/or email address.

29.     Lists of email addresses, particularly active email addresses, have commercial value and are bought, sold or leased regularly in interstate commerce. As such, many of the companies which assemble and maintain their own email address lists zealously guard the privacy of such lists and carefully limit or control access to such lists by third parties.

**D.     Email Marketing**

30.     As email has become an increasingly popular method of communication, it has become an increasingly attractive tool for individuals and businesses wishing to market products and services to the national and/or international public.

31.     Many legitimate businesses, including plaintiff and some members of plaintiff herein, collect email addresses from their own customers (and potential customers) and maintain their own internal email lists which they then use to send promotional materials, newsletters, advertisements and offers. Other businesses, including some of plaintiff's members herein, partner with legitimate e-marketing companies (service companies who have expended

9

considerable time and money to gather, collect and compile extensive email mailing lists), and pay these e-marketers to send out emails containing their promotional materials, newsletters, advertisements and offers.

32.     There are also a large number of unscrupulous persons and businesses, including (without limitation) pedophiles, who misuse email as a means of bombarding computer users with a significant amount of unwanted and often inappropriate email messages. Commonly referred to as "spammers," many of these less scrupulous persons and businesses operate offshore and/or under pseudonyms, making it incredibly difficult or virtually impossible to track them down or enforce laws against them.

33.     It is estimated that legitimate businesses in the United States spend a substantial amount on email advertising annually, and that such advertising generates many millions of dollars a year in revenue for these legitimate businesses and constitutes a substantial portion of our national economy.

34.     Given the large number of people who use email on a daily basis, and the significant amount of revenue generated by email marketing (legitimate and illegitimate) on an annual basis, "good" email lists—i.e., those known to contain active email addresses, have become an increasingly valuable commodity.

**E.     The CPR Act and the Division's Administrative Rules**

*Key Provisions of the CPR Act*

35.     The CPR Act does four things. First, it authorizes the Division to create (either on its own or through contract with a third party) a registry of email addresses which purportedly belong to or may be accessed by Utah minors. Second, it makes it unlawful for "any person" to send any prohibited email to any email address listed in the registry which has been registered for more than thirty (30) days. Third, it establishes criminal, administrative and civil enforcement

10

mechanisms. Fourth, it requires any e-marketer who wishes to send a commercial email that may ultimately be received by a recipient located in Utah to submit its proprietary email list to the Division (and/or its third party contractor), and pay a fee to the Division (and/or the third-party contractor) to have its email list "scrubbed" against the registry.

### Creation of the Registry

36.     Section 201 of the CPR Act requires the Division to "establish and operate a child protection registry" (the "Registry"), "to compile and secure a list of contact points," or to "contract with a third party to establish and secure the [R]egistry," and requires the Division to "implement the [R]egistry . . . beginning on July 1, 2005." U.C.A. § 13-29-201(1) & (2)(a).

37.     Section 102(1) of the CPR Act defines a "contact point" as any "electronic identification" to which a communication may be sent," and initially includes *only* email addresses. *Id.* § 13-29-102(1). Pursuant to Sections 101(1)(b) and 201(2) of the CPR Act, the term "contact point" *may* be extended in the unspecified future to include instant message identities, cell phone numbers, telephone numbers, facsimile numbers and/or other similar electronic addresses. *See* U.C.A. §§ 13-29-101(1)(b) & -201(2).

38.     Section 201(3)(a) of the CPR Act allows any "person" to register with the Division any email address which either belongs to a Utah minor, or may be accessed by a Utah minor, including those belonging to and accessed primarily (if not exclusively) by adults. *See id.* § 13-29-201(3)(a).

39.     Section 201(3)(b) of the CPR Act allows a "school or other institution that primarily serves minors" to register its entire domain name with the Division, and thereby register every email address on its domain, even those belonging to adult faculty and staff. *Id.* § 13-29-201(3)(b).

Prohibited Emails

40.     Once an email address has been listed on the Registry for at least thirty (30) calendar days, Section 202(1) of the CPR Act makes it unlawful for any person to "send, cause to be sent, or conspire with a third party to send a communication" to that email address if the communication "(a) advertises a product or service that a minor is prohibited by law from purchasing; or (b) contains or advertises material that is harmful to minors. . . ." U.C.A. § 13-29-202(1).

41.     The CPR Act does not specifically define the products and services "that a minor is prohibited by law from purchasing," but effectively prohibits the transmission to any registered email address any email communication that in any way advertises, promotes or features, among other things, alcohol, tobacco, gambling and prescription drugs. Because there is nothing in the CPR Act that expressly requires the email to advertise "primarily" such goods or services, it potentially outlaws any email message that even tangentially references or refers to such goods and services, or contains a link to any website which may, knowingly or unbeknownst to the sender of the email, contain a reference to a prohibited good or service.

42.     The term "harmful to minors" is defined by reference to U.C.A. § 76-10-1201, and essentially outlaws any email message that contains or advertises material with sexual content, in any form.

Enforcement

43.     The CPR Act provides for civil, criminal and administrative enforcement:

        a.      Section 301 of the CPR Act (i) calls any violation of the CPR Act a "computer crime," and (ii) renders each prohibited email a separate criminal violation. U.C.A. § 13-29-301(1) & (4).

12

     b.     Section 302 of the CPR Act (i) allows a private cause of action to be brought by the "user" of a registered contact point and/or his or her "legal guardian," (ii) allows the recovery of the greater of actual damages or $1,000 in statutory damages, and (iii) mandates an award of "costs and reasonable attorney fees" to the prevailing party in any such lawsuit. *Id.* § 13-29-302.

     c.     Section 303 of the CPR Act requires the Division to "investigate violations" and "assess cease and desist orders and administrative fines." *Id.* § 13-29-303.

     <u>Compliance</u>

44.     In order to comply with the provisions of the CPR Act, email marketers like plaintiff and its members must either (a) refrain from sending any even potentially prohibited email messages to any email address, including those addresses which belong to adult users inside and outside of the State of Utah, or (b) submit its proprietary email lists to the Division (and/or its third party contractor) every thirty (30) calendar days to determine which of its email addresses might be listed on the Registry and then refrain from sending any even potentially prohibited email message to the identified email addresses.

45.     Section 202(2)(a) of the CPR Act requires the Division to "provide a mechanism under which a person" desiring to send email messages "may verify compliance with the registry to remove registered contact points from the person's communications." *Id.* § 13-29-202(2)(a).

46.     Pursuant to the authority granted it under Section 203 of the CPR Act, the Division has promulgated administrative rules establishing (a) a procedure for registering email addresses on the Registry, and (b) a mechanism under which persons such as plaintiff and its members "may verify compliance with the [R]egistry to remove registered contact points from the person's communications." U.C.A. § 13-29-203.

47.    Pursuant to Section 13-29-201(1)(b) of the CPR Act, the Division has entered into a contract with Unspam Technologies, Inc. ("Unspam"), and has delegated its authority to create and maintain the Registry to Unspam.

a.    Unspam markets itself as "an Illinois-based business and government consulting company helping to draft and enforce effective anti-spam laws." Upon information and belief, Unspam's business model is centered around (a) its ability to secure passage of child protection registry statutes in as many states as possible, (b) its ability to defend such statutes against constitutional and other challenges, and (c) its ability to secure contracts with these states to create and maintain their registries, and perform the required scrubbing services. Upon information and belief, Unspam was one of the chief lobbyists for the CPR Act, and was instrumental in convincing the Legislature that the CPR Act was not pre-empted by the CAN-SPAM Act, and did not violate the provisions of the United States Constitution and/or Utah Constitution.

b.    Pursuant to the terms and conditions of R152-39-3(1) of the Utah Administrative Code ("U.A.C."), any email address may be registered on the Registry simply by providing Unspam with "(a) the email address the person desires to register; (b) an affirmation that a minor has access to the email address; (c) an affirmation that the minor who has access to the email address is a Utah resident; and (d) an affirmation that the person registering the email address is a parent or guardian of the minor who as access to the email account."

c.    Neither Unspam nor the Division are required to take any action to verify the accuracy of the information provided by the registrant, or to confirm that the email address in fact belongs to or is accessible by a Utah minor, and there are *no* penalties for misrepresenting these facts.

14

       d.       Upon information and belief, Unspam's proprietary software is new, and will be put to real time use for the first time in connection with the Registry created by the CPR Act. Upon information and belief, there is no way to know for sure whether Unspam's software is truly secure, or whether the addresses maintained on the Registry could be unlawfully accessed by spammers, pedophiles, and other would be hackers. Indeed, the Legislature recognized this risk by requiring the Division to post on its website a disclaimer warning potential registrants that the security of the registered email addresses could not be guaranteed, and might be a greater risk of misappropriation.

       48.     Pursuant to Section 202(2) of the CPR Act the Division has established a procedure whereby e-marketers such as plaintiff and its members can have their proprietary email lists "scrubbed" by Unspam to identify those email addresses contained on the Registry and thereby avoid sending to those addresses a potentially prohibited email message.

       a.       Pursuant to R152-39-4, any e-marketer "desiring to verify compliance with the [R]egistry shall provide" to Unspam (1) "the name, address, and telephone number of the marketer," (2) "the specific legal nature and corporate status of the marketer," and (3) "the name, address and telephone number of a natural person who consents to service of process for the marketer."

       b.       The e-marketer must then submit its proprietary email list to Unspam, and pay the Division a fee of $0.005 for every email address on its email list. *See* U.C.A., R152-39-4.

       c.       Using its own proprietary technology, Unspam then generates a list of those registered email addresses which are contained on the e-marketers mailing list.

       d.       For providing this statutorily mandated service, Unspam will receive 4/5 of the total fee paid to the Division by the e-marketer.

49.     If the email marketer "scrubs" its email lists in accordance with Section 202(2) of the CPR Act, there is nothing in the CPR Act or the Division's administrative rules that actually immunizes the e-marketer from liability if for some reason the process fails to identify a registered email address.

**G.     Security Risks and Privacy Concerns**

50.     The Registry creates a master list of active email addresses, particularly those belonging to and/or accessible by Utah minors.

51.     As a compilation of active email lists, the Registry will become an attractive target for would-be hackers, including off-shore spammers and pedophiles, who seek to quickly and inexpensively obtain a list of valid email addresses and/or verify the validity of their existing email lists, and who are the least likely to comply with the provisions of the CPR Act.

52.     Unscrupulous persons or entities could obtain information from the Registry in at least two ways. First, they could pose as a legitimate e-marketer, present an email list to Unspam, pay the required fee, and not only verify the email addresses as active, but identify which of those email addresses belong to or may be accessible by Utah minors. Second, they could hack into Unspam's system and steal the ready compiled list of active email addresses.

53.     As a necessary result of compliance with the procedures created by the CPR Act, e-marketers will be forced to maintain a database of those email addresses identified on the Registry. These databases will be maintained on the computer networks of every legitimate e-marketer who chooses to comply with the CPR Act, and could also be unlawfully obtained by hackers, including offshore spammers and pedophiles.

54.     Should the Registry or any discrete portion thereof find its way into the hands of these unscrupulous hackers, the result would be an increase in the amount of email messages,

particularly pornography and other inappropriate messages, being sent to the very persons the CPR Act seeks to protect.

55.    There can be no guarantee that either Unspam's proprietary software or the security features on the networks of the various e-marketers can fully prevent against unlawful access by such hackers.

56.    Although the CPR Act contains provisions prohibiting the unlawful use and acquisition of the Registry, these provisions are not likely to deter the most unscrupulous hackers, and will be difficult to enforce.

57.    The Federal Trade Commission ("FTC") issued a report to the United States Congress in June 2004, recognizing these risks and concerns, and recommended against the creation of a National Do Not Email Registry.

58.    The Utah Legislature likewise acknowledged these potential risks and concerns, expressly requiring the Division to specifically disclose them to potential registrants:

> The division shall provide a disclosure to a person who registers a contact point under this section that reads: "No solution is completely secure. The most effective way to protect children on the Internet is to supervise use and review all email messages and other correspondence. . . . While every attempt will be made to secure the Child Protection Registry, registrants and their guardians should be aware that their contact points may be at a greater risk of being misappropriated by marketers who choose to disobey the law."

U.C.A. § 13-29-201(3)(c).

## H.    Pre-emption Under Section 7707 of the CAN-SPAM Act

59.    In 2003, the United States Congress (the "Congress") enacted the CAN-SPAM Act in an effort to combat the increasing pervasiveness and negative consequences of unsolicited email messages.

17

60.     One primary purpose of the CAN-SPAM Act was to harmonize inconsistent state statutes aimed at combating the proliferation of unsolicited email messages through the promulgation of a uniform national regime.

61.     Recognizing the national and international scope of the Internet in general, and of email in particular, and acknowledging the need and importance of uniform regulation of this national and international mode of communication, Congress included in Section 7707 of the CAN-SPAM Act language expressly pre-empting the ability of state and local governments to individually regulate commercial email messages:

> (1) **In general**
>
> This chapter supersedes *any statute, regulation, or rule of a State or political subdivision of a State that expressly regulates the use of electronic mail to send commercial messages*, except to the extent that any such statute, regulation, or rule prohibits falsity or deception in any portion of a commercial electronic mail message or information attached thereto.

15 U.S.C. § 7707(b) (1) (2003) (italicized emphasis added).

62.     In enacting the CAN-SPAM Act, Congress specifically considered the creation of a national do not email list, expressly authorizing the FTC to prepare a plan for the implementation of such a nationwide registry. The FTC ultimately concluded, however, that such a registry was not feasible, would increase the prevalence of unsolicited email messages, and would expose our nation's children to even more inappropriate content.

63.     Section 7707(b)(2) of the CAN-SPAM Act exempts from pre-emption only those state regulatory schemes that are not "specific" to email, or that relate to "acts of . . . computer crime."

*The CPR Act Is Specific to Email*

64.     The CPR Act is specific to email, and is therefore preempted by CAN-SPAM. The CPR Act prohibits the transmission of any commercial email message to any registered

email address insofar as the email message contains prohibited content, and its specific purpose is therefore the regulation of commercial email.

65.     Although the CPR Act may eventually allow the registration of and thereby regulate communications to other "contact points" besides email messages, such as instant messaging identities, cellular phone numbers, telephone numbers, and facsimile numbers, the CPR Act applies initially only to email addresses, and the Registry will not be made available to any other "contact point" (if at all) until some unspecified future time. *See* U.C.A. § 13-29-201(2)(b) & (c).

*The CPR Act is Not a Computer Crimes Statute*

66.     Section 301(1) of the CPR Act characterizes a violation of its provisions as a "computer crime" in an attempt to avoid application of Section 7707 of the CAN-SPAM Act.

67.     The sending of a prohibited email message to a registered email address does not constitute a "computer crime"; and is not a "computer crime" as that term has been defined elsewhere in the Utah Code, or as it is commonly understood in the law.

**H.     The Cost of Compliance and the Effects on Interstate Commerce**

68.     In order to comply with the CPR Act and avoid liability for sending an inappropriate email to a registered email address, legitimate e-marketers like plaintiff and its members will be required to either (a) disclose its proprietary email list to Unspam on a monthly basis, and pay the fee to have its list "scrubbed" against the Registry, or (b) refrain from sending any emails containing any even potentially inappropriate content to any email address for fear that the email address may be listed on the Registry. Compliance under either of these scenarios will result in significant costs and burdens to legitimate e-marketers, including plaintiff and its members, and will unduly and unreasonably burden interstate commerce.

19

*The Cost of Scrubbing Email Lists Against the Registry*

69.     The average member of plaintiff maintains an email list containing thousands of email addresses, and it will therefore cost the average member of plaintiff a substantial amount of money per month to have Unspam scrub its email list against the Registry.

70.     Plaintiff itself currently maintains an email list containing thousands of email addresses, and thus it will cost a substantial amount of money per month to have Unspam scrub its email list against the Registry.

71.     Upon information and belief, Unspam's system does not currently interface with Mac and Linux based systems. E-marketers, including (without limitation) plaintiff's members who maintaining their email address lists on these systems will either be unable to comply with the CPR Act, or will be required to convert their lists into a compatible system, at significant cost.

72.     In order to interface with the Unspam system and have its emails scrubbed plaintiff and its members will be required to make a number of hardware and software changes to their existing systems, at a significant cost.

73.     In addition to the hard cost of having Unspam scrub their email list, legitimate e-marketers, including plaintiff and its members, will be required to (a) create and maintain their own secure database of those email addresses identified as being on the Registry, (b) review all of their email messages for any content that is even potentially prohibited under the CPR Act, and (c) insure that such email messages are not sent to any of the registered email addresses. Plaintiff estimate that the internal cost of implementing these procedures will cost millions thousands of dollars per year.

74.     Legitimate e-marketers such as plaintiff and its members have contracts and privacy agreements with their advertising partners or clients for whom they do email advertising

which require that their email lists be kept confidential, and that they not be sold or otherwise disclosed. The advertising partners themselves often have similar contracts and privacy agreements with their customers. Compliance with the provisions of the CPR Act may result in breaches of these underlying contracts and privacy agreements, and could result in damage awards and attorneys' fees and costs, further escalating the cost of compliance.

75.     These additional costs will ultimately be passed through to the consuming public inside and outside of the State of Utah, impacting consumers nationwide and imposing an undue and unreasonable burden on interstate commerce.

*The Cost of Refraining From Sending Any Potentially Inappropriate Email*

76.     Insofar as the cost of "scrubbing" the emails becomes prohibitive for plaintiff and other e-marketers, or is prohibited by existing contract and/or privacy agreements, the only way to comply with the CPR Act would be to refrain from sending to any email address any message that contains any potentially inappropriate content. In this regard, the CPR Act effectively regulates conduct that occurs wholly outside the State of Utah, imposes Utah's standards on the citizens of other states, and imposes an undue and unreasonable burden on interstate commerce.

*Other Effects on Interstate Commerce*

77.     The Internet, like other interstate and international communication systems, is by its very nature an instrument of interstate commerce, and constitutes an area of the economy and society that by its unique nature demands cohesive national treatment.

78.     Although the CPR Act purports to regulate the content only of email messages sent to a Utah resident, such emails frequently pass through multiple computer networks, and travel across multiple transmission lines, in multiple states, before reaching the intended recipient. Moreover, because email accounts can frequently be accessed from any computer, any

where in the world, there is no way to know whether the recipient is actually in Utah at the time the email is received, opened and reviewed.

79.     The CPR Act regulates the content of email messages based on predominately local standards, prohibiting email messages in anyway advertising products or services that cannot be lawfully purchased by minors in the State of Utah (and which may or may not be unlawful for minors to purchase in other states), as well as email messages containing material which is "harmful to minors" under Utah Code Ann. § 76-10-1201(4), a definition which depends, in part, on the "prevailing standards in the adult community" in the State of Utah as a whole. If each state implements its own regulations, as Utah and Michigan have now done, regarding what information can be legally distributed to minors (or others) via email, interstate commerce will be greatly inhibited and disrupted as email marketers throughout the country (and the world) try to discern what can and cannot be communicated to the registered email addresses in the various jurisdictions. As a result, email marketers will be forced to self-censor all of their email messages and conform them to the standards of the most restrictive jurisdiction(s), or create multiple email messages tailored to the standards of each individual state. This imposes an undue and unreasonable burden on interstate commerce.

80.     The CPR Act also prohibits interstate (rather than intrastate) communication, prohibiting the transmission of prohibited emails originating from e-marketers in one state to minors residing in Utah.

81.     The CPR Act likewise prohibits email communications to an email account belonging to a resident of a state other than Utah, merely on the representation that the account may be accessed by a minor residing in Utah, and thereby prohibits interstate communications outside the State of Utah.

82.    Although the CPR Act requires the registrant to affirm at the time of registration that the registered email act belongs to or is accessible by minors residing in the State of Utah, there is nothing in the CPR Act or the Division's rules that requires the registrant to remove the email address from the Registry if the minor moves out of State, and thus the CPR Act effectively regulates interstate communications outside the State of Utah.

**I.    The CPR Act's Effects and Burdens on Free Expression**

83.    The irreparable impact of the CPR Act on email speech in general, and on the expressive rights of plaintiff and its members, in particular, are far reaching.

84.    Commercial speech is protected under the First and Fourteenth Amendments of the United States Constitution and Article I, Section 15 of the Utah Constitution.

85.    The CPR Act requires e-marketers and their advertising partners, including Plaintiff, to self-censor all of their email communications, and to send to registered email addresses only those emails that do not contain prohibited material under the CPR Act. In this regard, the CPR Act constitutes a content based, prior restraint on commercial speech.

86.    The terms of the CPR Act and its implementing regulations are vague and overbroad in at least the following ways.

a.    The CPR Act imposes criminal, civil and administrative penalties against anyone who sends a prohibited email to a registered email address, even if that person first scrubs their email list against the Registry in accordance with Section 202(2) of the CPR Act and R152-39-5 and an email address for some reason slips through.

b.    The CPR Act allows for the registration not only of those email addresses belonging to a minor, but of any email address even potentially accessible by the minor. Likewise, while the Division and/or Unspam have created a mechanism by which persons can remove their email address from the registry when the minor reaches the age of eighteen, there is

23

nothing in the CPR Act or the Division's rules requiring removal. As such, the CPR Act unduly burdens free speech among adults.

c.      There is nothing preventing persons from registering email addresses on the Registry that do not actually belong to and are not actually accessible by minors within the State. Although the CPR Act purports to limit the Registry only to email addresses owned by or accessible to minors residing in the State of Utah, and although R152-39-3 technically requires registrants to affirm that these prerequisites are met at the time of registration, neither the Division nor Unspam are required to verify the accuracy of such representations, and neither the CPR Act nor the Division's rules impose any penalty for misrepresentation of these facts.

d.      The CPR Act prohibits the transmission of any email message that in any way "advertises" a product or service which a minor cannot lawfully purchase in the State of Utah. The term "advertise" is not specifically defined, however, and could be broadly construed to include, among other things, (i) advertisements for events which are open to minors but sponsored, in whole or in part, by companies who sell prohibited goods or services, (ii) any email message which makes any reference to any prohibited item, including an email advertisement or newsletter that merely links to a website containing such content, and/or (iii) any email advertisement or newsletter relating to prescription drugs, firearms, or any other goods or services that may be lawfully acquired by minors with adult consent.

e.      The CPR Act prohibits the transmission of any email message containing content that is "harmful to minors," as that term is defined in Utah Code Ann. § 76-10-1201(4). The CPR Act fails to distinguish, however, between material that is "harmful" for older as opposed to younger minors.

f.      Insofar as e-marketers determine that it is too cost prohibitive to scrub their email list against the Registry, or that existing contract and/or privacy agreements prevent

such disclosure, the only effective way to comply with the statute will be to purge all of their emails of any content that even potentially violates the provisions of the CPR Act. Because the CPR Act prohibits emails that advertise any product or service not lawfully purchased by a minor in Utah, regardless of whether minors may acquire such goods or services in other states, and because Section 76-10-1201(4) defines the phrase "harmful to minor" to include "prevailing standards in the adult community [in the State of Utah] as a whole with respect to what is suitable for minors," the CPR Act effectively imposes Utah's standards on email recipients in all other states.

g.    The CPR Act applies broadly to "any person" and is not limited to e-marketers or other commercial entities who advertise for profit. There is nothing in the CPR Act that would preclude a civil claim, criminal prosecution or administrative action against an individual who merely uses email as a forum to share his or her beliefs and views with others about the prohibited topics. By way of non-exclusive example, the broad provisions of the CPR Act could apply to any individual activist who chooses email as the most effective means to advocate changes to Utah's liquor laws, urge the adoption of a State lottery to fund public education, or call for broader rights to purchase and carry firearms.

87.    There are available alternative means to limit a minor's access to offensive email material, and that do not unnecessarily burden free expression or interstate commerce. First, parents can monitor their children's computer and Internet activities, and screen messages in their email accounts to identify and delete any offensive messages. Second, many ISPs and commercial online services like America Online already provide features that subscribes may use to block unwanted emails based on content and thereby prevent children from receiving such information. Third, computer owners may acquire special software applications, commonly referred to as "filters" or "spam-blockers" to effectively block and filter unwanted email

messages and control the content of the messages delivered to their accounts. Each of these alternatives, while not perfect, constitute a far less restrictive, and considerably more reasonable alternative means of protecting children than the far-reaching restrictions of the CPR Act. For parties unwilling or unable to comply with the scrubbing requirements of the Act, the CPR effectively reduces all email communications to that which is appropriate for children.

**J.    Unequal Impact**

88.    The CPR Act prohibits e-marketers and others from sending to any registered email address any email message advertising any good or service which it is unlawful for a Utah minor to buy, regardless of whether the advertisement is specifically targeted at minors. In this regard, the CPR Act prohibits conduct by e-marketers that is not prohibited by television and radio advertisers, billboard owners, newspapers, direct mail, or other more traditional forms of media. By way of non-exclusive example, there is no Utah law prohibiting a billboard operator from displaying an advertisement for Budweiser or some other alcoholic beverage, despite the fact that the advertisement may be viewed by minors. Thus, the CPR Act makes an irrational distinction between e-marketers on one hand, and more traditional marketers on the other.

**K.    Irreparable Harm**

89.    If enforcement of the CPR Act is not immediately enjoined, and plaintiff or its members are required to comply with its provisions, plaintiff and its members will be irreparably harmed in any number of ways:

a.    Insofar as plaintiff or its members decide to comply with the CPR by self-censoring the content of their email messages and refraining from sending to any email address any email messages that contain any potentially prohibited content, plaintiff and its members will be irreparably harmed by, among other things:

26

      i.      Foregoing their rights of free expression protected under the First and Fourteenth Amendments to the United States Constitution and/or Article I, Section 15 of the Utah Constitution;

      ii.      Foregoing the right to participate in interstate and foreign commerce under Article I, Section 8 of the United States Constitution;

      iii.      Incurring the additional cost, burden and expense of reviewing the content of their email messages to eliminate those messages with any potentially prohibited content;

      iv.      Foregoing the income they would otherwise receive from consumers or from their clients and advertising partners by sending potentially prohibited email messages;

      v.      Breaching their existing contracts and agreements with clients and/or advertising partners whose email messages cannot be sent because they contain potentially prohibited content; and/or

      vi.      Damaging their relationships with existing and prospective clients and/or advertising partners whose email messages cannot be sent because they contain potentially prohibited content.

      b.      Insofar as plaintiff or its members decide to comply with the CPR by scrubbing their email list against the Registry and refraining from sending to any registered email address any email messages that contain any potentially prohibited content, plaintiff and its members will be irreparably harmed by, among other things:

      i.      Foregoing their rights of free expression protected under the First and Fourteenth Amendments to the United States Constitution and/or Article I, Section 15 of the Utah Constitution;

ii.    Foregoing their right to participate in interstate and foreign commerce;

iii.    Having to disclose their proprietary email lists to Unspam, increasing the chance of theft or misappropriation by some third party;

iv.    Incurring the substantial monthly expense of paying Unspam to scrub their email list against the Registry;

v.    Incurring the additional cost, burden and expense of maintaining an internal database of registered email addresses, reviewing the content of their email messages to eliminate those with even potentially prohibited content, and ensuring that such email messages are not sent to the registered email addresses;

vi.    Foregoing the income they would otherwise receive from their clients and/or advertising partners by sending potentially prohibited email messages to the identified email addresses;

vii.    Being forced to breach their contracts with existing clients and/or advertising partners whose email messages can no longer be sent because they contain potentially prohibited content, subjecting them to potential damages and/or attorneys' fees and costs; and/or

viii.    Being forced to breach their existing contracts and/or privacy agreements with their clients and/or advertising partners by disclosing their email list to Unspam, subjecting them to potential damages and/or attorneys' fees and costs;

ix.    Damaging their relationships with existing and prospective clients and/or advertising partners whose email messages cannot be sent to the registered addresses because they contain potentially prohibited content, or who are unwilling to provide email addresses to plaintiff or its members for fear of disclosure to Unspam.

## FIRST CAUSE OF ACTION
### (For Violation of the First and Fourteenth Amendments to the United States Constitution)

90.    Plaintiff repeats and realleges the allegations of the foregoing paragraphs of this Complaint as if fully set forth herein.

91.    Among its activities, plaintiff publishes and disseminates by email a newsletter and other communications alerting its members and others, and discussing, news, information and opinion regarding public questions, and issues of social and political importance that are intertwined with its members commercial interests and activities. Such communications may also contain advertisements or other commercial speech, or links to web sites containing commercial speech.

92.    The email communications of plaintiff and its members are entitle to the full protection of the First Amendment to the U.S. Constitution, and defendants' regulations of plaintiff's and its members' speech are subject to protection pursuant to a strict scrutiny analysis under the First Amendment. See New York Times Company v. Sullivan, 376 U.S. 254 (1964). In the alternative, plaintiff's and its members' email communications are entitled to protection under the First Amendment to the U.S. Constitution as constitutionally protected commercial speech. See Central Hudson Gas & Elec. Corp. v. Public Service Commission of New York, 447 U.S. 557, 566 (1980).

93.    The CPR Act, on its face and as applied to plaintiff and its members, violates the First and Fourteenth Amendments of the United States Constitution because it, among other things:

    a.    Constitutes an unlawful prior restraint on the expressive activities of plaintiff, its members and other e-marketers, depriving plaintiff, its members, their advertising partners and the members of the consuming public access to constitutionally protected speech, and the ability to transmit and receive information via email;

      b.     Prohibits truthful and non-misleading commercial speech; and/or

      c.     Is vague and overbroad, prohibiting more expressive activity than is necessary to advance any governmental interest.

94.     The restraints and restrictions which the CPR Act imposes on the rights of plaintiff, its members and others to engage in expressive activity are not justified by any compelling state interest, and are not sufficiently tailored to advance any governmental purpose.

95.     Plaintiff and its members are entitled to an order declaring that the CPR Act is void and invalid because it impermissibly interferes with free expression as protected by the First and Fourteenth Amendments of the United States Constitution

96.     Plaintiff and its members are also entitled to a temporary, preliminary and permanent order from this Court enjoining the operation, effectiveness and enforcement of the CPR Act on the basis that it violates the First and Fourteenth Amendments of the United States Constitution.

**SECOND CAUSE OF ACTION**
**(For Preemption Under Section 7707 of the CAN-SPAM Act)**

97.     Plaintiff repeats and realleges the allegations of the foregoing paragraphs of this Complaint as if fully set forth herein.

98.     The CPR Act constitutes a specific regulation on email and is preempted by Section 7707(b) of the CAN-SPAM Act.

99.     Plaintiff are entitled to an order declaring that the CPR Act is void and invalid because it is preempted by Section 7707(b) of the CAN-SPAM Act.

100.     Plaintiff are also entitled to a temporary, preliminary and permanent order from this Court enjoining the operation, effectiveness and enforcement of the CPR Act on the basis that it is preempted by Section 7707(b) of the CAN-SPAM Act.

30

## THIRD CAUSE OF ACTION
### (For Violation of the Commerce Clause of the United States Constitution)

101.    Plaintiff repeats and realleges the allegations of the foregoing paragraphs of this Complaint as if fully set forth herein.

102.    The CPR Act violates Article I, Section 8 (the "Commerce Clause") of the United States Constitution by, among other things:

a.    Impermissibly regulating protected speech of plaintiff and its members outside the borders of the State of Utah;

b.    Imposing the community standards and regulations of the State of Utah on plaintiff, its members and email recipients nationwide;

c.    Subjecting plaintiff, its members and other e-marketers to inconsistent email regulations among the various states; and/or

d.    Unreasonably increasing the costs and burdens of conducting interstate commerce for plaintiff, its members and other e-marketers.

103.    The burdens that the CPR Act imposes on interstate and foreign commerce are undue, unreasonable and excessive in relation to any local benefits the CPR Act may confer.

104.    The CPR Act is vague and overbroad, prohibiting more interstate and foreign commerce than is reasonably necessary to advance any governmental interest.

105.    Plaintiff and its members are entitled to an order declaring that the CPR Act is void and invalid because it impermissibly interferes with interstate commerce in violation of the Commerce Clause of the United States Constitution.

106.    Plaintiff and its members are also entitled to a temporary, preliminary and permanent order from this Court enjoining the operation, effectiveness and enforcement of the CPR Act on the basis that it violates the Commerce Clause of the United States Constitution.

31

## FOURTH CAUSE OF ACTION
### (For Violation of Article I, Section 15 of the Utah Constitution)

107.    Plaintiff repeats and realleges the allegations of the foregoing paragraphs of this Complaint as if fully set forth herein.

108.    The CPR Act, on its face and as applied to plaintiff and its members, violates Article I, Section 15 of the Utah Constitution because it, among other things:

a.    Constitutes an unlawful prior restraint on the expressive activities of plaintiff, its members and other e-marketers, depriving plaintiff, its members, their advertising partners and the members of the consuming public access to constitutionally protected commercial content, and the ability to transmit and receive information via email;

b.    Prohibits truthful and non-misleading commercial speech; and/or

c.    Is vague and overbroad, prohibiting more expressive activity than is necessary to advance any governmental interest.

109.    The restraints and restrictions which the CPR Act imposes on the rights of plaintiff, its members and others to engage in expressive activity are not justified by any compelling state interest, and are not sufficiently tailored to advance any governmental interest.

110.    Plaintiff and its members are entitled to an order declaring that the CPR Act is void and invalid because it impermissibly interferes with free expression as protected by Article I, Section 15 of the Utah Constitution.

111.    Plaintiff and its members are also entitled to a temporary, preliminary and permanent order from this Court enjoining the operation, effectiveness and enforcement of the CPR Act on the basis that it violates Article I, Section 15 of the Utah Constitution.

## FIFTH CAUSE OF ACTION
### (For Violation of Article I, Section 24 of the Utah Constitution)

32

112.    Plaintiff repeats and realleges the allegations of the foregoing paragraphs of this Complaint as if fully set forth herein.

113.    The CPR Act does not operate uniformly, and prohibits conduct by e-marketers and internet advertisers, including (without limitation) plaintiff and its members, which is not unlawful for other marketers or advertisers

114.    Compliance with the CPR Act would impose a series of unreasonable, arbitrary and expensive burdens on plaintiff, its members and other e-marketers and internet advertisers; burdens that are not shared by other more traditional marketers or advertisers.

115.    The distinction between e-marketers and internet advertisers and other more traditional marketers is arbitrary and unrelated to the State's stated interest of protecting Utah minors from harmful content, and unfairly and unnecessarily burden e-marketers and internet advertisers.

116.    Plaintiff and its members are entitled to an order declaring that the CPR Act is void and invalid because it impermissibly interferes with plaintiff's and its members' rights to equal treatment under the law under Article I, Section 24 of the Utah Constitution.

117.    Plaintiff and its members are also entitled to a temporary, preliminary and permanent order from this Court enjoining the operation, effectiveness and enforcement of the CPR Act on the basis that it violates Article I, Section 24 of the Utah Constitution.

## SIXTH CAUSE OF ACTION
### (For Attorneys Fees' and Costs pursuant to 42 U.S.C. § 1988)

118.    Plaintiff repeats and realleges the allegations of the foregoing paragraphs of this Complaint as if fully set forth herein.

119.    The CPR Act's restriction of plaintiff's and its members' right to engage in expressive activity under the First and Fourteenth Amendments of the United States Constitution, and its violation of the Commerce Clause of the United States Constitution,

33

constitute a deprivation under color of state law of rights, privileges, and immunities secured by the United States Constitution, within the meaning of 42 U.S.C. § 1983.

120.    Pursuant to 42 U.S.C. § 1988, plaintiff and its members are entitled to an award of those reasonable attorneys' fees and costs incurred to prosecute this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff request the following relief:

1.    An order declaring the Child Protection Registry Act, Utah Code Ann. § 13-29-101 *et seq.*, void and invalid because it is preempted by Section 7707(b) of the CAN-SPAM Act;

2.    An order declaring the Child Protection Registry Act, Utah Code Ann. § 13-29-101 *et seq.*, void and invalid because it impermissibly interferes with interstate commerce in violation of Article I, Section 8 of the United States Constitution.

3.    An order declaring the Child Protection Registry Act, Utah Code Ann., § 13-29-101 *et seq.*, void and invalid because it impermissibly restrains and restricts expressive activity in violation of the First and Fourteenth Amendments of the United States Constitution.

4.    An order declaring the Child Protection Registry Act, Utah Code Ann. § 13-29-101 *et seq.*, void and invalid because it impermissibly restrains and restricts expressive activity in violation of Article I, Section 15 of the Utah Constitution.

5.    An order declaring the Child Protection Registry Act, Utah Code Ann. § 13-29-101 *et seq.*, void and invalid because it unlawfully distinguishes between e-marketers and internet advertisers on one hand, and more traditional marketers and advertisers on the other, in violation of Article I, Section 24 of the Utah Constitution.

6.    A temporary, preliminary and permanent order enjoining the operation, effect and enforcement of the Child Protection Registry Act, Utah Code Ann. § 13-29-101 *et seq.*, on the basis that it is void and invalid because it:

a.     Is preempted by Section 7707(b) of the CAN-SPAM Act;

b.     Impermissibly interferes with interstate and foreign commerce in violation of Article I, Section 8 of the United States Constitution;

c.     Impermissibly restrains and restricts expressive activity in violation of the First and Fourteenth Amendments of the United States Constitution;

d.     Impermissibly restrains and restricts expressive activity in violation of Article I, Section 15 of the Utah Constitution; and/or

e.     Unlawfully distinguishes between e-marketers and other more traditional marketers in violation of Article I, Section 24 of the Utah Constitution.

7.     For an award of those reasonable attorneys' fees and costs incurred in prosecuting this action, pursuant to 42 U.S.C. § 1988.

8.     For such other and further relief as this Court deems appropriate and just.

DATED this 17th day of November, 2005.

Jerome Mooney, Esq. (Utah Bar No. 2303)

Mooney Law Firm
50 W. Broadway, #100
Salt Lake City UT 84101
Tel: (801) 364-6500
Fax: (801) 364-3406

Attorneys for Plaintiff

Ira P. Rothken, Esq. (Pro Hac Vice)

ROTHKEN LAW FIRM
1050 Northgate Drive, Suite 520
San Rafael, CA 94903
Telephone:    (415) 924-4250
Facsimile:    (415) 924-2905

Attorneys for Plaintiff

35

%JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| FREE SPEECH COALITION, INC., A California Not-For-Profit Trade Association, On Its Own Behalf and On Behalf of Its Members, | THE STATE OF UTAH, a body politic, et al. (see additional defendants attached) |

**(b)** County of Residence of First Listed Plaintiff    **Los Angeles**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Ira P. Rothken, ROTHKEN LAW FIRM, 1050 Northgate Drive, Ste. 520, San Rafael CA 94903, Tel: (415) 924-4250

Attorneys (If Known)

FILED
U.S. DISTRICT COURT
2005 NOV 17 A 9: 42
DISTRICT OF UTAH
BY:
DEPUTY CLERK

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability / **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle / ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability / ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury / ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☒ 890 Other Statutory Actions |
| **REAL PROPERTY** / **CIVIL RIGHTS** / **PRISONER PETITIONS** | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting / ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment / **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations / ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare / ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment / ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other / ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights / ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003, 15 U.S.C. § 7701 et seq.

Brief description of cause:
Utah's Child Protection Registry Act, Utah Code Ann. § 13-39-101 et seq. (the "CPR Act") is pre-empted by Fed

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):    JUDGE _____    DOCKET NUMBER _____

DATE
11/16/2005

SIGNATURE OF ATTORNEY OF REC

FOR OFFICE USE ONLY

RECEIPT #    AMOUNT    APPLYING IFP

Judge J. Thomas Greene
DECK TYPE: Civil
DATE STAMP: 11/17/2005 @ 09:35:08
CASE NUMBER: 2:05CV00949    JTG

## ADDITIONAL DEFENDANTS

THE UTAH DEPARTMENT OF COMMERCE, a department in the executive branch of the State of Utah; THE DIVISION OF CONSUMER PROTECTION, an administrative agency in the Utah Department of Commerce; MARK SHURTLEFF in his official capacity as Utah Attorney General of the State of Utah; FRANCINE GIANI, in her official capacity as the Executive Director of the Utah Department of Commerce, and in her official capacity as the Director of the Division of Consumer Protection in the Utah Department of Commerce,