**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

|  |  |
|---|---|
| **FREE SPEECH COALITION, INC.,** | |
| Plaintiff, | |
| | **MEMORANDUM DECISION** |
| vs. | **AND ORDER** |
| | |
| **MARK SHURTLEFF, KEVIN V. OLSEN, UNSPAM REGISTRY SERVICES, INC.,** | **Case No. 2:05CV949DAK** |
| Defendants. | |

This matter is before the court on Plaintiff Free Speech Coalition's Motion for Preliminary Injunction, Defendant Unspam Registry Services' Motion to Dismiss for Lack of Jurisdiction, Defendants Mark Shurtleff and Kevin V. Olsen's Motion to Dismiss for Lack of Jurisdiction, Unspam's Motion to Strike Portions of Plaintiff's Briefs and Submissions, and Unspam's Motion to Strike Affidavit in Support of Motion. The court held a hearing on these motions on November 8, 2006. At the hearing, Plaintiff was represented by Stephen F. Rohde and Jerome Mooney, Unspam was represented by Parker Douglas and Brent O. Hatch, and Defendants Mark Shurtleff and Kevin V. Olsen ("State Defendants") were represented by Thom D. Roberts. The court has carefully considered the pleadings, memoranda, and affidavits submitted by the parties, the arguments advanced by the parties at the hearing on the motions, and the law and facts relevant to the motions. Now being fully advised, the court renders the following Memorandum Decision and Order.

**BACKGROUND**

Plaintiff Free Speech Coalition is a trade association that allegedly represents over 3000 members "involved in the production, dissemination, or production of sexually explicit non-obscene expression." Plaintiff has brought this action seeking declaratory and injunctive relief as to the constitutionality of provisions in the Utah Child Protection Registry Act, Utah Code Ann. § 13-39-202 ("CPR").  The CPR, which in its amended form went into effect May 1, 2006, allows parents or guardians of minor children in Utah to register electronic "contact points"with the Utah Consumer Protection Division to prevent certain unwanted communications. A contact point includes an email address, an instant message identity, a mobile or other telephone number, a facsimile number, or an electronic address  Under the provisions of the CPR, absent consent from an adult in control of a minor's "contact point":

> (1) A person may not send, cause to be sent, or conspire with a third party to send a communication to a contact point or domain that has been registered for more than 30 calendar days . . . if the communication:
> (a) has the primary purpose of advertising or promoting a product or service that a minor is prohibited from purchasing; or
> (b) contains or has the primary purpose of advertising or promoting material that is harmful to minors, as defined in Section 76-10-1201.

Utah Code Ann. § 13-39-202(1).  Section 76-10-1201 is a criminal statute that defines materials harmful to minors as consisting of nudity, sexual conduct, sexual enticement, or sadomasochistic abuse when it:

> (a) Taken as a whole, appeals to the prurient interest in sex of minors;
> (b) Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors; and
> (c) Taken as a whole does not have serious value for minors.  Serious value includes only serious literary, artistic, political, or scientific value for minors.

Utah Code Ann. § 76-10-1201.  This criminal provision is a felony, punishable up to five years in prison, and has been upheld as constitutional.  *See id.* § 76-10-1206; *State v. Burke*, 675 P.2d 1198 (Utah 1984).

Plaintiff alleges that both it and "many of its members" send email messages that the CPR purports to regulate.  Plaintiff seeks a declaration from this court that the CPR is unconstitutional and an injunction prohibiting the enforcement of the CPR.  Specifically, Plaintiff contends that: (1) the CPR is expressly preempted by the federal CAN-SPAM Act of 2003, P.L. 108-187, codified at 15 U.S.C. §§ 7701 - 7713 and 18 U.S.C. § 1037; (2) the CPR violates the dormant Commerce Clause of the United States Constitution; and (3) the CPR violates the First Amendment of the United States Constitution and Article I, Section 15 of the Utah Constitution.

Defendants Mark Shurtleff, Kevin V. Olsen, and Thad Levar are sued in their official capacities only.  Defendant Unspam Registry Services, Inc. is a for-profit corporation that has contracted with the State of Utah to "scrub" email lists for emailers at a cost of .5 cents per name.  The only way that emailers can determine whether or not any particular email address in Utah has been registered under the CPR is to register to participate in the Registry's so-called "scrubbing" services and have Unspam compare hash values to look for matches with any contact point on the Registry.

## DISCUSSION

Although Plaintiff's Motion for Preliminary Injunction was filed first, Defendants' motions to dismiss argue that Plaintiff lacks standing to bring the present case. Because a lack of standing implicates whether this court has jurisdiction to decide the merits of the case before it, the court will address the motions to dismiss first.

### Defendant UNSPAM's Motion to Dismiss

Unspam moves to dismiss Plaintiff's Complaint for lack of standing, and Defendants Shurtleff and Olsen have filed a notice joining in Unspam's motion to dismiss.  .  "In every federal case, the party bringing the suit must establish standing to prosecute the action." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004).  An association has constitutional standing when it seeks judicial relief in its own right to redress an injury to the organization itself.  *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).  An organization may also have associational standing to assert claims on behalf of its members in a representative capacity when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief sought requires the participation of the individual members of the lawsuit."  *Id.*

Under either type of standing, the association and/or its individual members must meet Article III standing requirements.  Article III requires: (1) a concrete and particularized "injury in fact" that is not conjectural or hypothetical; (2) a causal connection between the alleged injury and the challenged conduct such that the injury is "fairly traceable" to the defendants' conduct; and (3) a likelihood that the injury will be "redressed by a favorable decision."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

When a motion to dismiss is based on a plaintiff's failure to allege grounds for federal jurisdiction, the court must consider the allegations of the complaint as true.  *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002).  The motion should only be granted if it appears that the plaintiff can prove no set of facts supporting its claim that would entitle it to the relief sought.  *Yoder v. Honeywell, Inc.*, 104 F.3d 1215, 1224 (10th Cir. 1997).

### A.  Plaintiff's Standing to Sue on Its Own Behalf

Defendants assert that Plaintiff does not have standing to sue on its own behalf because it has not alleged that it sends messages that are covered by the CPR and, therefore, it has not been injured by the CPR.  Because of the disjunctive nature of subsection 13-39-202(1)(b), the CPR applies to (1) an email that "has the primary purpose of advertising or promoting a product or service that a minor is prohibited from purchasing"; (2) an email that "contains . . . material that is harmful to minors, as defined in Section 76-10-1201"; and (3) an email that "has the primary purpose of advertising or promoting material that is harmful to minors, as defined in Section 76-10-1201."  Utah Code Ann. § 13-39-202(1).

Plaintiff's Second Amended Complaint alleges that Plaintiff  "regularly disseminates via email to its adult members, to its adult supporters, and to other adults interested in receiving it, the *Free Speech X-press*, which, on a weekly basis, reports and comments upon legal, political, and social developments of concern to those who oppose censorship of expression and to those who seek to remain free to produce, disseminate, and receive presumptively protected sexually oriented expression."  Second Amended Complaint ¶ 9.  These emails also include "a link to the FSC web site, and that web site regularly contains banners advertising such matters as conferences and trade shows concerning the adult entertainment industry."  *Id.*

Although Plaintiff's emails are allegedly intended to be aimed at only adults and report on developments of concern in the area of censorship, Plaintiff alleges that "from time to time" its "*Free Speech X-Press* . . . reports on matters that may be unsuitable for consideration by minors."  Therefore, the communications could be covered by CPR.  Other than using the CPR registry, there would be no way for Plaintiff to know whether a minor had access to certain accounts.  Plaintiff further asserts that it has standing to sue on its own behalf because it sends

emails advertising and promoting its own conferences and trade shows that minors are prohibited from attending.  With respect to those emails, its entire purpose is to advertise and promote such conferences and trade shows.  Depending on the specific content of Plaintiff's emails, the court finds that Plaintiff runs the risk of prosecution for distributing material "harmful to minors." The court, therefore, finds that Plaintiff's allegations that such material is likely to be obscene to minors is adequate at this pleading stage to confer standing.

### B.  Associational Standing

With respect to Plaintiff's associational standing to sue on behalf of its members, Defendants argue that there is no associational standing under the *Hunt* test because Plaintiff has not alleged a concrete injury to its members and some of Plaintiff's claims require the participation of the individual members.  Defendants contend that Plaintiff's allegations are insufficient because they claim that Plaintiff's members' emails are directed solely to adults and are non-obscene, but *may* be legally obscene (i.e. harmful) as to minors.  Plaintiff argues that it meets each of the *Hunt* elements.

Under the first prong of the *Hunt* test, Plaintiff alleges that "most of FSC's members' email expression . . . consists of messages the principle purpose of which is either to propose a commercial transaction or to facilitate a previously agreed upon commercial transaction over the Internet," many of which "commercial transactions—proposed or facilitated—involve products or services that minors in Utah are legally prohibit[ed] from purchasing, especially in light of the involvement of FSC's members in the adult entertainment industry."  These allegations establish that Plaintiff's members would otherwise have standing to sue in their own right.

Under the second prong of the *Hunt* test, the interests Plaintiff seeks to protect must be germane to the organization's purpose.  Plaintiff's interest in representing its members

and providing services to its members and members of the public is implicated by its ability to send email communications between the various parties.  Therefore, the second element of the *Hunt* test is met.

Defendants argue that under the third prong of the *Hunt* test, Plaintiff lacks associational standing because its claim regarding the constitutionality of Section 13-39-202(1)(a) "requires the participation of the individual members in the lawsuit."  432 U.S. at 343.  Plaintiff's Complaint acknowledges that its members' communications practices are varied.  Although Defendants attack the use of the words "some," "most," and "many," there is no requirement in associational standing that 100% of an organization's members have standing in their own right.  All of Plaintiff's members engage in the uniform practice of sending emails that are likely covered by the CPR.  The interests of those members are identical and nothing in the Second Amended Complaint alleges otherwise.  Therefore, on the face of the Complaint, the challenge to the constitutionality of the CPR does not require the participation of individual members in the lawsuit.  Moreover, Plaintiff's complaint only seeks injunctive and declaratory relief, not damages for Plaintiff and/or any of the individual members.  Therefore, the court finds that Plaintiff has associational standing to sue on behalf of its members.  Accordingly, Defendant Unspam's motion to dismiss is denied.

### The State Defendant's Motion re: Limited Standing Claims of Plaintiff

The State Defendants move for a ruling that Plaintiff has no standing with respect to Utah Code Annotated Section 13-39-202(1)(a).  Subsection (a) applies to an email that "has the primary purpose of advertising or promoting a product or service that a minor is prohibited from purchasing."  To the extent that Plaintiff and Amici have submitted affidavits, exhibits, or arguments regarding the effect of or constitutionality or enforceability of subsection (a), Defendants ask for them to be stricken and an order in limine entered.  Defendant Unspam filed

a notice joining in the State Defendants' motion.  This motion is similar to Unspam's motion to dismiss except that it focuses only on subsection (a) and seeks to exclude certain evidence relating to that subsection.

Defendants assert that Plaintiff and its members have no intention to engage in conduct, and they do not claim to engage in conduct, that comes within the provisions of subsection (a) – advertising a product that a minor is prohibited by law from purchasing.  Rather, they allege that they have the intention to engage in conduct and that they engage in conduct that falls within the proscription of subsection (b)—sending or advertising material harmful to minors.

In *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990), the court struck down some of the challenged provisions as violative of the constitutional rights of the plaintiffs, upheld some provisions, and refused to reach the merits of the challenges as to some of the provisions based on lack of standing.  *Id.* at 233-34.  In *CAMP Legal Defense Fund Inc. v. City of Atlanta*, 2006 WL 1623279 (11th Cir. 2006), the court also dealt with the issue of requiring standing as to each of the challenged provisions.  The court rejected a party's argument that standing to challenge some provisions allowed it to challenge all of the provisions.  Even under the relaxed standing allowed in some First Amendment cases, standing still has to exist as to each challenged provisions.  *Id.*

Relying on the same arguments it asserted against Unspam's motion to dismiss, Plaintiff argues that it has standing to challenge both subsections of Section 13-39-202(1). Plaintiff contends that the only reasonable interpretation of subsection (a) is that it deals with the transaction in which goods and services are bought and sold.  For someone to sell certain goods or services to a minor, the minor must purchase such goods and services.  Plaintiff claims that the state cannot be arguing that while the sale to minors of such sexually explicit goods and

services is prohibited, their purchase by minors is somehow allowed.  If the State is seriously

urging this court to enter a declaratory judgment that subsection (a) does not apply to any email

communication on the basis of sexual content, then Plaintiff will have prevailed on that aspect of

this action and can focus on the unconstitutionality of subsection (b).

      Defendants assert that they are making the argument that subsection (a) does not

apply to email communications merely on the basis of sexual content.  Subsection (a) requires

that the communication involve advertising or promoting a product "that a minor is prohibited

by law from purchasing."  The statutory provisions with regard to material harmful to minors

(and also pornography) explicitly prohibit the distribution or sale of the materials but also

explicitly do not make it unlawful to purchase the materials.  The quintessential examples of

products under subsection (a), alcohol and tobacco, on the other hand, explicitly prohibit the

purchase and criminalize the purchase or possession of those substances by a minor.  Defendants

contend that there is a difference between prohibited by law from purchasing and prohibited by

law from selling.

      Defendants also object to the characterization by Plaintiff that it "will have

prevailed on that aspect of this action" by a determination that Plaintiff lacks standing to

challenge that provision.  Rather, this case should be allowed to go forward, if at all, only on

those challenges to statutory provisions that actually apply to the Plaintiff and its members.

      Defendants mailed a letter to many of Plaintiff's members on November 7, 2005,

stating that "[t]he Division has taken the position that the Child Protection Registry covers those

that may send or provide content for sending commercial email that advertises: 1. an alcoholic

beverage or product; 2. any form of tobacco; 3. pornographic materials; and 4. any product or

services that is illegal in Utah . . . such as illegal drugs, prostitution, and gambling."  This letter

makes it clear that the State intends to enforce subsection (a) against Plaintiff's members.

Because of such intent, Plaintiff has standing to assert its members interests as to subsection (a) as much as subsection (b).[1]  Furthermore, Plaintiff alleges that it sends its own emails advertising conferences that minors could not lawfully attend.  Accordingly, the State Defendants' motion to dismiss is denied.

### Plaintiff's Motion for Preliminary Injunction

Plaintiff seeks a preliminary injunction from this court enjoining the Defendants from enforcing any of the provisions contained in the CPR.  In order to obtain preliminary injunctive relief, the moving party must establish:

> (1) a substantial likelihood that the movant will eventually prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued, would not be adverse to the public interest.

*SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098 (10th Cir. 1991).  Because a preliminary injunction is an extraordinary remedy, the "right to relief must be clear and unequivocal." *Id.*

Plaintiff's motion focuses primarily on the likelihood of success on the merits of its claims.  "[W]here a preliminary injunction 'seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme" no arguably lesser standards for the issuance of a preliminary injunction are applicable.  *Heideman v. South Salt Lake* City, 348 F.3d 1182, 1188 (10th Cir. 2003).  Plaintiff must meet its burden of establishing that each of the four required elements for a preliminary injunction weigh clearly and unequivocally in its favor.  *Id.*

---

[1]  Plaintiff, however, has only the right to make arguments for its members.  The court has received materials from Amici that do not relate to the same issues or concerns as Plaintiff's members.  These materials are of little relevance, but the court finds no need to strike them from the record.  The court is capable of reviewing the materials submitted and limiting its consideration of the materials to only those items that are relevant to the specific legal issues pending before it.

**I.  Likelihood of Success on the Merits**

      In this case, Plaintiff has raised constitutional challenges to the CPR under the Supremacy Clause (preemption), the doctrine of the dormant Commerce Clause , and the First Amendment of the United States Constitution and Article I, Section 15 of the Utah Constitution. Each claim will be discussed separately.

      **A.  Preemption**

      The first issue is whether the CPR is preempted by the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 ("CAN-SPAM Act").  In 2003, the United States Congress enacted the CAN-SPAM Act because it was concerned with unsolicited commercial email, commercial email that was disguised or fraudulent as to its source or purpose, and the vulgar and pornographic nature of much of the commercial email.  15 U.S.C. § 7701. The CAN-SPAM Act (1) prohibited false or misleading transmission information, (2) prohibited deceptive subject headings, (3) required return address and an opt-out feature for future emails, and (4) required a heading identifying sexually oriented materials as such and requiring that the material not be immediately viewable upon opening the email.  *Id.* § 7704.

      With respect to a "do-not-email" registry, CAN-SPAM did not create one nor did it prohibit the creation of one by the states or the federal government.  Rather, it directed the Federal Trade Commission to prepare a report setting forth a plan for establishing a national "do-not-email" registry and discussing any problems with such a registry.  *Id.* § 7708.

      The preemption provisions of CAN-SPAM are contained in Section 7701(b), which provides:

> (b) State law
>     (1) In general
>         This chapter supersedes any statute,
> regulation, or rule of a State or political subdivision
> of a State that expressly regulates the use of

> electronic mail to send commercial messages, except to the extent that any such statute, regulation, or rule prohibits falsity or deception in any portion of a commercial electronic mail message or information attached thereto.
>
> (2) State law not specific to electronic mail
>
>> This chapter shall not be construed to preempt the applicability of –
>
> (A)    State laws that are not specific to electronic mail, including State trespass, contract, or tort law; or
>
> (B)    Other State laws to the extent that those laws relate to acts of fraud or computer crime.

*Id.* § 7701(b).

Plaintiff contends that the CPR is preempted by Section 7701(b)(1).  In determining whether a federal act preempts state legislation, a court must consider whether preemption has occurred in any one of three forms: (1) language in a congressional enactment which creates express preemption; (2) preemption that is implied by the breadth of a congressional scheme that occupies an entire legislative filed; or (3) preemption implied because of a conflict with a congressional enactment.

Where a congressional enactment has an express preemption provision, the court's "task is to identify the domain expressly pre-empted, because an express definition of the pre-emptive reach of a statute supports a reasonable inference that Congress did not intend to pre-empt other matters."  *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001).  The focus should be "on the plain wording of the clause, which necessarily contains the best evidence of Congress's preemptive intent."  *Sprietsma v. Mercury* Marine, 537 U.S. 51, 62-63 (2002).  Courts also "work on the assumption that the historic police powers of the States are not to be

superseded by the Federal Act unless that is the clear and manifest purpose of Congress." *Lorilland*, 533 U.S. at 541-42.  The presumption against preemption applies both to the existence of preemption and the issue of the scope of any preemption.

Plaintiff argues that CAN-SPAM expressly preempts state laws such as the CPR because the CPR expressly regulates commercial email in a manner dramatically inconsistent with CAN-SPAM.  This argument, however, moves from express preemption immediately to implied preemption based on a conflict with a congressional enactment.  In order to determine whether there is express preemption, the court must examine the language of CAN-SPAM.

The express preemption provision in CAN-SPAM is a clear indicator of Congress's intent because it directly and specifically describes the area of state authority superseded by the statute.  The "purpose of Congress is the ultimate touchstone" in every preemption case.  *Retail Clerks v. Schermerhorn*, 375 U.S. 96, 103 (1963).  Relevant to this inquiry is "the structure and purpose of the statute as a whole, as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumer, and the law."  *Medtronic Inc. v. Lohr*, 518 U.S. 470, 485 (1996).

CAN-SPAM's language evidences that Congress's basic purpose in enacting the legislation was to create a national standard for rules governing the structure of commercial email messages and the techniques used to send them.  15 U.S.C. §§ 7701, 7703, 7704.  The statute expressly acknowledges that federal legislation alone cannot be viewed as, and is not in fact, the sole solution to the problems created by the rapid growth and abuse of spam and adult-oriented messages.  *Id.* § 7701(5), (12).  CAN-SPAM also expressly states that it does not apply to state laws that are not specific to electronic email or those involving computer crimes.  *Id.* § 7707(b).

Plaintiff claims that the CPR does not fall within either of the exceptions to preemption provided for in CAN-SPAM.  First, Plaintiff contends that the CPR cannot reasonably be viewed as a state law that is "not specific to email" because the CPR repeatedly refers to email and defines a "contact point" by listing email as the first means of electronic communication.  Defendants argue that the express terms of the CPR are not specific to only email because it regulates contact points, only one of which is email.   Defendants assert that had Congress wanted to preempt every statute that mentioned email or purported to regulate email among other things, it easily could have done so in exacting terms.  It did not.  The court believes that this case demonstrates that the language of CAN-SPAM with respect to laws "not specific to email" could be interpreted to support either side in this controversy.  The court need not conclusively determine the meaning and application of the language given that the issue before it is whether Plaintiff can demonstrate a likelihood of success on the merits.  This court cannot conclude that the language of CAN-SPAM excepting laws "not specific to email" clearly supports Plaintiff's position.

With respect to the second exception to preemption contained in CAN-SPAM, Plaintiff argues that the CPR cannot reasonably be viewed as regulating "computer crime." Plaintiff contends that for CAN-SPAM's "computer crime" exception to have any meaning it must pertain to something other than laws that criminalize certain computer mediated email transmissions, or else the exception would swallow up the rule.  Plaintiff asserts that the real meaning of "computer crimes" relates to property damage, unauthorized access to a computer system, or impairing the physical integrity of the system.  Thus, Plaintiff argues that any alleged offense based on the content of an email cannot constitute a "computer crime" against the recipient's computer.

CAN-SPAM's exception for computer crimes, however, is an express acknowledgment that criminal provisions regarding public welfare are within the province of the state's police powers.  "It is fundamental in our federal structure that States have vast residual powers."  *McCulloch v. Maryland*, 316 L. Ed. 579 (1819).  State police powers are traditionally considered to extend at a minimum to issues of public health, safety, and morals.  The CPR is presumptively a proper exercise of Utah's police powers, as the Supreme Court has acknowledged the state's interest in safeguarding parents' right "to authority in their own household to direct the rearing of their children [which] is basic in the structure of society."  *Ginsberg v. New York*, 390 U.S. 636, 639 (1968).  The Court has called the "liberty interest . . . of parents in the care, custody, and control of their children . . . perhaps the oldest recognized by this Court."  *Troxel v. Granville*, 530 U.S. 57, 65 (2000).  There is no clear and manifest attempt to displace these historic police powers in CAN-SPAM.

Plaintiff fails to acknowledge that the CPR refers to acts of computer crime under Utah law.  Prior to the passage of the CPR, it was already a crime in Utah to target children with pornographic messages.  *See* Utah Code Ann. § 76-10-1206 (2005).  The CPR also defines a violation of Sections 13-39-301(1) and (2) as computer crimes.  Had Congress wanted to specify certain versions of computer crimes for exemption, it certainly could have.  It appears to be left broad to allow states to define their own "computer crimes" under their traditional police powers.

The United States filed a statement of interest asserting the position that CAN-SPAM does not preempt the CPR because the exception for state laws relating to computer crimes applies.  The United States points out that Congress did not define "computer crime" and neither party has presented the court with any basis for concluding that "computer crime" is a term of art with a single commonly accepted meaning.  The United States, however, asserts that

the proper definition of the words "computer crime" – one which pays due regard for the presumption against preemption provisions—encompasses crimes involving computers that have traditionally been the subject of state police-power regulations.  There can be no doubt that the protection of children from sexually explicit materials is such an area.   The Supreme Court upheld the "obscene as to minors" standard nearly forty years ago and it is that standard that is incorporated in the Utah definition of "harmful to minors" under Utah Code Ann. § 76-10-1201(3).  Therefore, the court concludes that the CPR falls within an express exemption to preemption contained in CAN-SPAM.

Plaintiff further attempts to argue that the federal opt-out registry provisions in CAN-SPAM was a part of the legislative design to regulate commercial email exclusively at the federal level.  Congress deferred the opt-out registry issue to the FTC.  Although Plaintiff asserts that this reveals unambiguous congressional intent to reserve all matters pertaining to an opt-out registry to the federal government, there is no evidence of this intent in the statute.  An agency's after-the-fact reports shed no light on the intent of Congress.  In fact, the Supreme Court has expressly cautioned against looking to such reports as any indication of statutory meaning. *American Trucking Ass'n v. Atchison, Topeka & Sante Fe Ry.*, 387 U.S. 397, 417 (1967).

Because the court finds that an express exemption to preemption applies, the court need not address the arguments Plaintiff makes with respect to implied preemption.  The express exceptions to preemption in CAN-SPAM demonstrate that Congress did not attempt to occupy the entire field.  In addition, the fact that the CPR fits within an express exemption to preemption contained in CAN-SPAM demonstrates that the CPR is not in conflict with CAN-SPAM.

If Congress had intended to completely displace all state regulation of commercial email, it certainly could have done so in CAN-SPAM.  It could have provided for no

exceptions.  But, it did not do so.  Congress' inclusion of an exception for computer crimes appears to be a recognition of the states' traditional police powers.  The CPR is a valid exercise of Utah's police power which is entitled to full presumptions against preemption.  Plaintiff has, therefore, failed to meet its burden of demonstrating success on the merits with respect to preemption.

### B.  Dormant Commerce Clause

Plaintiff asserts that the CPR is an unconstitutional violation of the dormant Commerce Clause.  The Supreme Court has held that the Commerce Clause of the United States Constitution contains a "negative command, known as the dormant Commerce Clause," which reserves "an area of trade free from interference by the States" and forbids state regulations that "erect barriers against interstate trade."  *American Trucking Ass'n v. Michigan Pub. Serv. Comm'n*, 125 S. Ct. 2419, 2422 (2005).  A state law violates the dormant Commerce Clause if it "affirmatively discriminates against interstate commerce" or if it "burden[s] interstate transactions only incidentally," even if on its face, the law treats intrastate and interstate transactions the same.  *Maine v. Taylor*, 477 U.S. 131, 138 (1986).  Laws of the second type are invalid if "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."  *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

Plaintiff argues that the only way to comply with Utah's CPR is to censor all of its email or submit its entire email list for scrubbing on a monthly basis according to the statutory scheme.  In either event, Plaintiff claims that the CPR has an extraterritorial effect which renders it per se invalid under the Commerce Clause because virtually everyone sending adult email would be forced to use Utah's registry to ensure that it was not sending email to someone listed on the registry.  Plaintiff contends that an interstate and even international system

like email is a poor subject for regulation by individual states, especially where such regulation is not strictly limited to in-state effects.

Plaintiff's dormant Commerce Clause is essentially a reiteration of its federal preemption claim, except it rests on the assumption that the CPR's alleged unconstitutionality violates an implied power of Congress to regulate interstate commerce, even absent congressional action.  Unlike preemption which is prompted by federal legislation, the dormant Commerce Clause allows the judiciary to determine the propriety of state regulation on an issue that Congress has not acted upon.

Plaintiff's claim under the dormant Commerce Clause suffers an analytical flaw because Congress has expressly allowed states to regulate commercial email, as discussed in the preceding preemption analysis.  In the CAN-SPAM Act, Congress acknowledged that there were computer crimes that it could not properly regulate alone.  "When Congress so chooses, state actions that it plainly authorizes are invulnerable to constitutional attack under the commerce clause." *Northeast Bancorp, Inc. v. Board of Governors*, 472 U.S. 159, 174 (1985).  Moreover, "the States retain authority under their general police powers to regulate matters of 'legitimate local concern,' even though interstate commerce may be affected." *Lewis v. BT Investment Managers, Inc.,* 447 U.S. 27, 36 (1980).  The dormant aspect of the Commerce Clause was not intended "to cut the States off from legislating on all subjects relating to health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country." *Huron Portland Cement Co.  v. Detroit*, 362 U.S. 440, 443-44 (1960).

The CPR does not discriminate between in-state and out-of-state senders.  Even assuming that the dormant Commerce Clause would otherwise invalidate the CPR, CAN-SPAM evidences Congress's consent to exempt such regulation from running awry of the Commerce Clause.  "The limitations on state authority created by the Commerce Clause cannot be

ascertained without reference to the relevant federal law" and if authorized by federal law cannot run afoul of the Commerce Clause. *Norfolk Southern Corp. v. Oberly*, 822 F.2d 388, 393 (3rd Cir. 1987).

Although heavily relied upon by Plaintiffs, cases such as *American Libraries Assoc. v. Pataki*, 969 F. Supp. 160 (S.D.N.Y. 1997) and *ACLU v. Johnson*, 194 F.3d 1149 (10th Cir. 1999) were decided before Congress enacted CAN-SPAM and are of limited value in the discussion of whether Congress allowed for simultaneous state regulation. Both cases also involve distinctly different types of statutes that were much broader in the attempted scope of regulation than the CPR.

Post CAN-SPAM cases are more instructive to the present case. In response to the argument that internet commerce demands consistent treatment and should be regulated only at the national level, the court in *Beyond Systems, Inc. v. Keynetics, Inc.*, 422 F. Supp. 2d 523 (D. Md. 2006), explained that "[w]hile perhaps interesting from an academic standpoint, it is clear that Congress itself, in enacting CAN-SPAM, specifically reserved to the States . . . authority to regulate certain aspects of Internet activity." *Id.* at 531. The *Beyond Systems* court also recognized that "[i]f Congress itself was satisfied that supplementary state legislation would impose no undue burden on interstate commerce, this Court can hardly presume to tell Congress it is wrong." *Id.* at 535.

Plaintiff further claims that the CPR does not pass the *Pikes* balancing test because the burden placed in commerce by the CPR is more substantial than the local benefits. Plaintiff complains that the cost of using the scrubbing service is an undue burden on it and if every state were to do as Utah has done, it would dramatically increases the costs of emailing. Even if the State interest in protecting children is great, Plaintiff contends the CPR threatens the economic well-being of certain businesses.

19

Plaintiff fails to recognize that the CPR provides it with the information it needs to comply with the existing criminal laws of the State of Utah.  It is a crime to distribute these materials to children.  The CPR now enables Plaintiff and its members to find out if a certain contact point is accessible by children.  Plaintiff acknowledges that it does not have a constitutional right to send its materials to children.

In addition, the small fee imposed to "scrub" each name on Plaintiff's list is not excessive.  The cost to "scrub" each email name is far less than if Plaintiff attempted to use traditional mail to send its message to the same number of recipients.  Moreover, if Plaintiff's list of recipients diminishes as a result of the CPR registry, its costs will also diminish over time.

Congress itself has found that "[t]he convenience and efficiency of electronic mail are threatened by the extremely rapid growth in the volume of unsolicited commercial electronic mail."  15 U.S.C. § 7701.  "Spam also costs recipients extra money, may expose recipients to obscene material, costs e-mail providers money, and is frequently fraudulent or deceptive." *Jaynes v Commonwealth*, 634 S.E.2d 357, 367 (Va. App. 2006) (citing 15 U.S.C. § 7701).  "That anti-spam laws, in general, produce local benefits is unquestionable."  *Id.*

In balancing these interests, the court finds that the fee charged for the scrubbing services is not an excessive burden in relation to the local benefits of enabling parents to protect their children from instant exposure to pornographic materials which is already illegal to send. Accordingly, the court finds that Plaintiff has not met its burden of demonstrating that it will likely succeed on the merits of its claim under the dormant Commerce Clause.

## C. First Amendment

Plaintiff's motion alleges several violations of the First Amendment and one violation of the Utah Constitution.  Plaintiff contends that its *Free Speech X-Press* email

newsletter and some of its member's emails constitute core political expression which is presumptively protected by the First Amendment.

Plaintiff argues that the CPR constitutes an impermissible prior restraint. Plaintiff claims that whether or not any of this expression is obscene as to minors or advertises products or services minors cannot lawfully purchase, it remains fully protected when addressed to its intended audience of consenting adults and is immune from unconstitutional prior restraints upon its dissemination. Because the only practical way to avoid the penalties of CPR is to submit email lists to the Registry and pay for scrubbing in advance of dissemination, Plaintiff contends that the CPR effectively imposes a prior restraint on email expression by it and its members. According to Plaintiffs, such prior restraints on presumptively protected expression are unconstitutional and enforceable only if they strictly specify narrow and definite standards to limit the discretion of the approving officials in order to insure that such officials will not base their decision to grant or deny approval upon their own evaluation of the content of the expression in question.

The regulations that the Court has "found invalid as prior restraints have had this in common: they gave public officials the power to deny use of a forum in advance of actual expression." *Hill v. Colorado*, 530 U.S. at 735 n.42. The CPR involves no licensing or pre-clearance system, nor does it require speakers to obtain the permission of anyone prior to speaking or to provide the content of its intended expression. The mere fact that a regulation requires that a party take some action in association with communicating a message does not transform the regulation into a prior restraint. It is also the court's understanding that the "scrubbing" process is nearly instantaneous so there are no issues with delay. The facts in this case do not demonstrate a prior restraint on Plaintiff's free speech rights.

A majority of Plaintiff's other First Amendment claims falter because the Supreme Court has repeatedly recognized the right of citizens to avoid unwanted communication, even in cases involving core political speech, as part of citizens' broader right to be left alone. *Hill v. Colorado*, 530 U.S. 703, 716-17 (2000). Supreme Court and Tenth Circuit precedent hold that when government empowers citizens to do so, the First Amendment is not violated when citizens control what speech enters their private domain.

Plaintiff and its members appear to be asserting that although they are not attempting to distribute sexually-oriented material to minors, the First Amendment gives them the right to send sexual messages that are "harmful to minors" directly to email addresses that belong to or are accessible by children because there can be no interference with their right to access to adults. This is so even if the adult in question has opted-out from receiving such material at certain contact points by choosing to participate in the Registry. Plaintiff also appears to be asserting that under First Amendment protections it should be able to make such contact anonymously.

Plaintiff asserts that all content based restrictions on speech, including the CPR, are subject to strict scrutiny, no matter what category of speech they might restrict. *See Sable Communications of Ca. Inc v. FCC*, 492 U.S. 115 (1989). Under strict scrutiny, a restriction must be necessary to satisfy a compelling state interest. *Id.* at 126. Although Plaintiff argues that the CPR is a content-based regulation of protected expression that should be subjected to strict scrutiny, the cases it relies on do not govern the First Amendment questions before this Court. In *Sable*, the court recognized that "there is a compelling interest in protecting the physical and psychological well-being of minors. This interest extends to shielding minors from the influence of literature that is not obscene by adult standards." *Id.*

The *Sable* Court also distinguished cases involving regulation of mediums that require affirmative steps to be taken by adults and those that are aimed at captive audiences of all ages.  While the "dial-a-porn" service before the *Sable* Court required "the listener to take affirmative steps to receive the communication" and involved callers willing to pay for the service, the Court recognized that these facts distinguished the case from *FCC v. Pacifica Foundation*, 438 U.S. 726 (1978).  *Pacifica* involved a partial ban on indecent, but not obscene, radio broadcasts, that required the broadcasts to run at certain times of day when children would most likely not be exposed to it.  *Id.* at 733.  The *Sable* Court recognized that unlike the dial-up aspect of its case, the *Pacifica* opinion relied on the uniquely pervasive attributes of broadcasting which "can intrude on the privacy of the home without prior warning as to program content, and is 'uniquely accessible to children, even those too young to read.'"  *Sable* 492 U.S. at 127 (quoting *Pacifica*, 438 U.S. at 726).  In *Pacifica*, the Court recognized that to "say that one may avoid further offense by turning off the radio is like saying that the remedy for an assault is to run away after the first blow.  One may hang up on an indecent phone call, but that option does not give the caller a constitutional immunity or avoid a harm that has already taken place."  *Pacifica*, 438 U.S. at 748-49.

Similarly, unsolicited sexual email unquestionably raises the captive-audience problem.  The digital mediums targeted in the CPR are used by all members of a family for a variety of different tasks.  The fact that the CPR protects only captive audiences of minors whose parents have affirmatively opted them out of receiving such materials significantly undermines Plaintiff's contention that the statute threatens the First Amendment rights of its members.  Moreover, as in *Pacifica,* this case does not involve a total ban on Plaintiff's emails.  The CPR sets up a Registry allowing parents to preclude emails to certain contact points accessible to children.  Unlike *Sable* which included a total ban for adults and children, the CPR allows adults

to register contact points accessible to children.  An adult in Utah could choose to receive

Plaintiff's emails on a personal email address or on a personal laptop, but opt-in to the Registry

for a family email account or any email account accessible on a family computer.  Obviously,

because of the opt-in nature of the Registry, it also allows an adult in Utah not to participate with

the Registry at all.  Furthermore, the content lines drawn by the CPR track lines drawn by the

Constitution itself.  The Utah definition of "harmful to minors" is, for all relevant purposes, the

same as the standard that the Court articulated and upheld in *Ginsberg*.

>    States may enact legislation enabling its citizens to prohibit even core political

speech from their own private domains without running awry of the First Amendment.  *See Hill*,

530 U.S. at 716-17.  "[T]he State's interest in protecting the well-being, tranquility, and privacy

of the home is certainly of the highest order in a free and civilized society."  *Frisby v. Schultz*,

487 U.S. 474, 484 (1988).  "One important aspect of residential privacy is protection of the

unwilling listener . . . [A] special benefit of the privacy all citizens enjoy within their own walls,

which the State may legislate to protect, is an ability to avoid intrusions.  Thus we have

repeatedly held that individuals are not required to welcome unwanted speech into their own

homes and that the government may protect this freedom."  *Id.* at 484-85.

>    The same logic defeats Plaintiff's claim of a "chilling effect" on its expressive

rights because there is no chilling effect on unwanted speech.  In *Rowan v. United States Post

Office*, 397 U.S. 728 (1970), the court recognized that "it seems to us that a mailer's right to

communicate must stop at the mailbox of the unreceptive addressee. . . . To hold less would

tend to license a form of trespass and would make hardly more sense than to say that a radio or

television viewer may not twist the dial to cut off an offensive or boring communication and thus

bar its entering his home."  *Id.* at 736-37.  The court directly held, "We therefore categorically

reject the argument that a vendor has a right under the Constitution or otherwise to send

unwanted material into the home of another. . . .  [N]o one has a right to press even 'good' ideas

on an unwilling recipient." *Id.* at 738.

      In applying *Rowan*, the Tenth Circuit has adopted a balancing test used by the

Seventh Circuit which is heavily weighted toward a citizen's right to restrict speech from his or

her home.  Dealing with speech usually accorded strict scrutiny protection, the Seventh Circuit

held that "because of the 'opt in' nature of the Act, we need only determine that the State's

interest in maintaining residential privacy for . . . citizens outweighs the speaker's right to

communicate his or her message into private homes."  *National Coalition of Prayer v. Carter*,

2006 WL 2088297 at *3 (7th Cir. July 28, 2006).  The Tenth Circuit, similarly, found that the

opt-in features of the national do-not-call registry easily made the act pass First Amendment

scrutiny.  *Mainstream Marketing Servs., Inc. v. FTC*, 358 F.3d 1228, 1237-46 (10th Cir. 2004).

The Tenth Circuit found that "the idea that an opt-in regulation is less restrictive than a direct

prohibition of speech applies not only to traditional door-to-door solicitation, but also to

regulations seeking to protect the privacy of the home from unwanted intrusions via telephone,

television, or the Internet."  *Id.* at 1243.

      In *Mainstream Marketing*, the Tenth Circuit analyzed the national do-not-call

registry and summarized the *Central Hudson* test as follows:

> *Central Hudson* established a three-part test governing First
> Amendment challenges to regulations restricting non-misleading
> commercial speech that relates to lawful activity.  First, the
> government must assert a substantial interest to be achieved by the
> regulation.  Second, the regulation must directly advance the
> governmental interest, meaning that it must do more than provide
> only ineffective or remote support for the government's purpose.
> Third, although the regulation need not be the least restrictive
> measure available, it must be narrowly tailored not to restrict more
> speech than necessary.  Together, these final two factors require
> that there be a reasonable fit between the government's objectives
> and the means it chooses to accomplish those ends.

358 F.3d at 1237.

The CPR satisfies the *Central Hudson* test in similar fashion to the do-not-call registry.  The CPR advances three substantial governmental interests:  Utah's interest in protecting minors from pornography and solicitations regarding materials harmful to them; Utah's interest in fostering the rights of parents to raise their children in a manner they see fit; and Utah's substantial interest in fostering privacy of the home from unwanted communications. The CPR is tailored to address these goals.  While it is easy to argue that the CPR cannot completely solve the problems it attempts to address, the case law only requires that the legislation be designed to reduce its targeted problem.  *Mainstream Marketing*, 358 F.3d at 1238-41.  The CPR is narrowly tailored through its opt-in feature to prevent exactly what it is designed to prevent: unwanted, adult-oriented speech from entering the home of unwilling recipients.  *See United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 815 (2000) (opt-in blocking of offensive programming "enables the Government to support parental authority without affecting the First Amendment interests of speakers and willing listeners.") The CPR only inhibits unwanted speech from entering the homes of unwilling participants, and it allows parents the option of participating or not participating.

Plaintiff next argues that the CPR suffers from unconstitutional vagueness because it does not define the terms "advertises" or "access."  In its reply memorandum, Plaintiff also asserts that the terms "primary purpose," "promoting," "minor," and "prohibited by law," are unconstitutionally vague.[2]  "There are two possible, and independent, reasons a statute may be impermissibly vague: 'First, if it fails to provide people of ordinary intelligence a reasonable

---

[2]  The fact that Plaintiff first raised this challenge in its reply memorandum is the basis of a motion to strike filed by Defendant UNSPAM.  The court, however, does not find a vagueness problem with any of these terms.  While it is inappropriate to raise an argument for the first time on appeal, the motion to strike with respect to these terms is essentially moot.

opportunity to understand what conduct it prohibits.  Second, if it authorizes or even encourages arbitrary and discriminatory enforcement.'" *Faustin v. City and County of Denver*, 423 F.3d 1192, 1201-02 (10th Cir. 2005).

In construing the terms of a statute, a court must recognize that a word "gathers meaning from the words around it."  *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 702 (1995).  In other words, statutory terms are defined by their statutory context.

The definition of a communication which "has the primary purpose of advertising" is not vague to the point that a person of ordinary intelligence could not understand what conduct is prohibited.  *Grayned v. City of Rockford*, 408 U.S. 104, 108-9 (1972); *see also Bystrom v. Fridley H.S.*, 822 F.2d 747, 753 (8th Cir. 1987) (finding term "advertises" not vague in school prohibition against written material that "advertises any product or service not permitted to minors by law").  The term advertises has a common understanding.  The court finds no vagueness problems with its use in the CPR.

The term "access" is also a term with a common understanding.  The CPR allows the registration of contact points to which minors have access.  The use of the term access in the CPR relates to an adults determination to register the contact point.  It does not relate to what the CPR prohibits Plaintiff from doing.  It also could not result in arbitrary or discriminatory enforcement of the CPR because all contact points that a registered are treated the same.

The remaining terms–"primary  purpose," "promoting," "minor," and "prohibited by law,"–similarly appear to pass First Amendment standards when read in the statutory context. The terms are easily understood, have common meanings, and reference applicable statutes that aid in their meaning.  Plaintiff has not demonstrated to the court that these terms would cause

difficulties in the application of the CPR.  Accordingly, the court finds that Plaintiff has failed to meet its burden with respect to its vagueness challenge.

Plaintiff further cites to *Tinker v. Des Moines Indep. Comm. Sch. Dist.*, 393 U.S. 503 (1969), to argue that minors enjoy First Amendment Rights particularly when it comes to matters of public interest, including controversial political issues.  Plaintiff contends that just as students do not shed their constitutional rights to freedom of speech at the schoolhouse gate, they also do not do so at their computer screens.  The *Tinker* case's holding that minors enjoy the right to receive information on matters of public controversy, however, does not provide a basis for suggesting that Plaintiff may send communications into a child's home when that child's parent has asked them not to do so.  Contrary to Plaintiff's assertions, minors do not have the right to receive indecent or illegal material and solicitation for things they cannot legally purchase, when parents have asked that such messages not be sent to those children, because the First Amendment protects vigorous debate and a vibrant democracy.

Finally, Plaintiff argues that under the free speech guarantees of the Utah Constitution, specifically Article I, Section 15 of the Utah Constitution, the rights guaranteed are "somewhat broader than the federal clause."  *Provo City Corp. v. Willden*, 768 P.2d 455 (Utah 1989).  In *American Bush v. City of South Salt Lake*, 140 P.3d 1235 (2006), the Utah Supreme Court recognized that there are free speech provisions in both article I, section 1, and article I, section 15.  *Id.* at 1241.  Article I, section 1 declares in relevant part that "[a]ll men have the inherent and inalienable right . . . to communicate freely their thoughts and opinions, being responsible for the abuse of that right." Utah Const. art. I, § 1.  Article I, section 15, states in relevant part that "[n]o law shall be passed to abridge or restrain the freedom of speech or of the press."  *Id.* art. I, § 15.

The court explained that the clause in section 1 "defines the scope of freedom of speech," and the clause contained in section 15 "prohibits governmental actions that abridge or restrain those rights." *American Bush*, 140 P.3d at 1241.  The court further expounded that no additional rights are secured by section 15 ("the governmental restriction clause") than are contained in section 1 ("the liberty and responsibility clause"). *Id.* at 1242.  The court determined that the "liberty and responsibility clause" contained in section 1 "articulates a conservative limitation upon the constitutionally granted freedom of speech right." *Id.* at 1248. In finding that the clause did not protect nude dancing at nude dancing establishments, the court appears to have announced that while the restrictions on governmental regulation of free speech are broader in the Utah Constitution, the free speech protections of the Utah Constitution are less protective than the federal Constitution. *Id.* at 1252-53.

In any event, Plaintiff has raised the Utah Constitution as a separate basis for relief, but it does not provide a separate analysis of free speech issues under the Utah Constitution.  Plaintiff fails to advance any arguments specific to the Utah Constitution. Therefore, it has not met its burden of demonstrating that it is likely to succeed on the merits of its claim under the Utah Constitution.

Therefore, the court concludes that Plaintiff has not met its burden of demonstrating a likelihood of success on the merits of its First Amendment challenges to the CPR.  Accordingly, based on the above reasoning, Plaintiff has not  met its burden that it will likely succeed on any of its challenges to the CPR.

## II.  Other Elements for Preliminary Injunction

In support of its motion for a preliminary injunction, Plaintiffs also argue that an infringement of constitutional rights constitutes irreparable harm, that such harm to its and its

members constitutional rights outweighs any injury Defendants could face, and the vindication

of constitutional infringements is in the public interest.

In *Heideman v. South Salt Lake City*, 348 F.3d 1182 (10th Cir. 2003), the

Tenth Circuit held that "to constitute irreparable harm, an injury must be certain, great, actual,

and not theoretical. . . . The party seeking injunctive relief must show that the injury complained

of is of such imminence that there is a clear and present need for equitable relief."  348 F.3d at

1189.  "An alleged constitutional infringement will often alone constitute irreparable harm."

*Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 472 (9th Cir. 1984).  In particular,

"[d]eprivation of the rights guaranteed under the Commerce Clause constitutes irreparable

injury."  *American Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 168 (S.D.N.Y. 1997).  Similarly,

"permitting states to regulate" where Congress has preempted state regulation "would violate the

Supremacy Clause, causing irreparable injury."  *TWA Inc v. Mattox*, 897 F.2d 773, 784 (5th Cir.

1990).

Violations of constitutional rights are given a presumption of irreparable harm,

but presumptions are not assumptions merely because allegations of such violations are asserted.

To do so would render the irreparable harm prong meaningless in these cases.   The Tenth

Circuit has stated that the merits of constitutional claims must be considered when evaluating

whether the presumption applies in a given case.  *Heideman*, 348 F.3d at 1190.  Because of this

court's findings and conclusions with respect to the merits of Plaintiff's claims, the presumption

usually accorded allegations of constitutional violations does not apply.

Plaintiff also argues that its members will be irreparably harmed if they violate

the CPR and are fined by Defendants.  Because the Eleventh Amendment may bar Plaintiffs'

members from suing Defendants to recover any such fines, Plaintiff contends such damages may

be irreparable.   However, "[i]t is also well settled that simple economic loss usually does not in

and of itself constitute irreparable harm." *Id.*   The court concludes that Plaintiff has not met its

burden of demonstrating clearly and unequivocally that it will be irreparably harmed absent the

issuance of a preliminary injunction.

With respect to the balance of harms, Plaintiff claims that the State of Utah will

suffer no substantial or irreparable injury because Congress and the FTC have already decided

that CAN-SPAM is an effective nationwide means of addressing the problems the CPR seek to

redress.  The Tenth Circuit, however, has observed that postponing the enforcement of a law is

itself an injury that weighs in favor of the Defendants. *Heideman*, 348 F.3d at 1190.  Moreover,

absent the statute's enforcement, parents will lose an ability to control the speech that enters

their home, their privacy will be compromised, and their right to raise their children as they see

fit will be infringed.  With the CPR, children whose parents have already registered contact

points under the registry will be subjected to the ravages of pornography recognized as harmful

by the *Ginsberg* court.  Such damage, by definition, cannot be remedied.  Given the strength of

the Defendants' arguments, Plaintiffs cannot meet its burden of demonstrating that its harm is

clearly and unequivocally greater than Defendants.

Finally, Plaintiff asserts that the issuance of a preliminary injunction is not

adverse to the public interest because the enforcement of the CPR would effectively overrule

Congress's decision not to implement a "do-not-email" registry.   Congress's stated intent in the

CAN-SPAM act, however, is for the FTC to look into a way to securely do such a list.  Congress

has not definitely or authoritatively decided the matter.  In addition, the court has found that the

language of CAN-SPAM expressly allows state statutes that regulate computer crimes, such as

the CPR.  Most importantly, the issue here is the public interest.  The Utah Legislature, elected

by the public, has passed the CPR to address the problems of unwanted communications that are

harmful to minors or that solicit the sale of something which minors cannot legally purchase.

Therefore, the court concludes that Plaintiff has not met its burden of demonstrating that the issuance of a preliminary injunction enjoining the enforcement of the CPR would not be adverse to the public interest.

The court concludes that Plaintiff has not met its burden of clearly and unequivocally establishing each element for the issuance of a preliminary injunction. Accordingly, Plaintiff's motion is denied.

## Defendant's Motions to Strike

Defendant Unspam moves to strike arguments raised for the first time in Plaintiff's reply brief in support of its motion for preliminary injunction and to strike portions of the reply and exhibits which complain or purport to be evidence of individualized harm. Although it is not proper to raise evidence and argument for the first time in a reply, the court's previous rulings have essentially made this motion moot.  Even considering this evidence and giving it the weight it deserved, Plaintiff has not met its burden for a preliminary injunction. However, because the evidence and arguments had limited value to the issues before the court and the court considered the evidence, Defendant's motion to strike is denied.

## Defendant's Motion to Strike Declaration of Justin Weiss

Defendant Unspam moves to strike the Declaration of Justin Weiss on the grounds that it is irrelevant, it fails to demonstrate that any email addresses were obtained from the Registry, and Plaintiff's argument regarding the FTC's concerns with a registry is immaterial to the legal issues before the court.  Defendant recognized that the rules of evidence do not apply in the preliminary injunction context. *Heideman*, 348 F.3d at 1188.  The court finds that even with the inclusion of the declaration, its findings and conclusions are not altered.  The declaration is of limited relevance to the legal issues before the court.  Therefore, Defendant's motion to strike is denied.

**CONCLUSION**

For the foregoing reasons, Plaintiff's Motion for Preliminary Injunction is

DENIED.  Defendant Unspam's  motion to dismiss is DENIED.  The State Defendants' Motion

to Dismiss is DENIED.  Defendant Unspam's motions to strike are DENIED.

DATED this 23rd day of March, 2007.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge