Parker Douglas (8924)
c/o Utah Federal Defenders Office
American Towers, Suite 110
46 West Broadway
Salt Lake City, Utah 84101
Tel:  (801) 524-5335
Fax: (801) 524-4060
Parker_Douglas@fd.org
*Counsel for Defendant Unspam Registry Services, Inc.*

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| FREE SPEECH COALITION, INC., A California Not-For-Profit Trade Association, On Its Own Behalf and On Behalf of Its Members, <br><br>     Plaintiff, <br><br> vs. <br><br> MARK SHURTLEFF in his official capacity as Utah Attorney General of the State of Utah; KEVIN V. OLSEN, in his official capacity as the Director of the Division of Consumer Protection in the Utah Department of Commerce, UNSPAM REGISTRY SERVICES, INC., a Delaware corporation <br><br>     Defendants. | **DEFENDANT UNSPAM REGISTRY SERVICES, INC.'s MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS** <br><br> Case No. 2:05-cv-00949 CW <br><br> Judge Clark Waddoups |

## TABLE OF CONTENTS

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii-iii

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv-viii

Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Standard of Review  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

A.        Preemption under Section 7707 of the CAN-SPAM Act . . . . . . . . . . . . . . . . . 3

      1.        <u>Relevant Legal Stahdards and Canons for Preemption Analysis</u> . . . . 6

      2.        <u>The CPR Act is Not Prempted Under CAN-SPAM's Plain Terms</u> . 12

B.        The CPR Act is Not Void for Violation of the Dorman Commerce Clause of the
      United States Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      1.        <u>Relevant Legal Standards and Policy Principles for Dorman</u>
             <u>Commerce Clause Analysis</u>  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      2.        <u>The CPR Act is Not Void Under the Dormant Commerce Clause</u>
             <u>Because Congress Has Explicitly Recognized the Validity of Such</u>
             <u>Acts in CAN-SPAM</u>  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

C.        The CPR Act Does Not Violate the Protections Accorded Free Speech by the
      United States and Utah Constitutions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

      1.        <u>Plaintiff's First Amendment Arguments Fail Because the CPR Act</u>
             <u>Merely Fosters Utah Citizen's Right to Avoid Unwanted</u>
             <u>Communication</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

A.   The CPR Act is Constitutional Under the Tenth Circuit'sJurisprudence Applying the *Central Hudson* test to Opt- In Regulatory Systems . . . . . . . . . . . . . . . . . . . . . . . . . . 31

2.   Plaintiff's Remaining Speech Claim as also Fails as the CPR Act Does not Violate the Fee Speech Protections of the Utah Constitution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## TABLE OF AUTHORITIES

**Cases Cited**

*Aldridge v. Williams*, 44 U.S. (3 How.) 9 (1845) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Barnes v. Glen Theater Inc.*, 501 U.S. 560, 569 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Bd. of Governors, Fed. Reserve Sys. v. Dimension Fin. Corp.*, 474 U.S. 361 (1986). . . . . . . . . 9

*Beer Co. v. Massachusetts*, 97 U.S. 25, 33 (1878) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Bethlehem Steel Co. v. N.Y. State Labor Relations Bd.*, 330 U.S. 767 (1947) . . . . . . . . . . . 11,17

*Bldg. and Constr. Trades Council v. Associated Builders and Contractors,* 507 U.S. 218 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Bowers v. NCAA*, 151 F.Supp.2d 526 (D. N.J. 2001)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*C&A Carbone, Inc. v. Clarkstown*, 511 U.S. 383 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Carter v. United States*, 530 U.S. 255, 271 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30,31,33,34

*Cipolone v. Liggett Group, Inc.*, 505 U.S. 504 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,7,8

*Cooley v. Board of Wardens*, 12 How. 299, 13 L.Ed. 996 (1852) . . . . . . . . . . . . . . . . . . . . . . 18

*Cooper Indus. v. Aviall Servs.*, 125 S.Ct. 577 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Dodd v. United States*, 125 U.S. 2478 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Engine Mfrs. Ass'n v. South Coast Air Quality Dist.*, 541 U.S. 246 (2004). . . . . . . . . . . . . . . 12

*FCC v. Pacifica Found.,* 438 U.S. 726 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*FDIC v. Meyer,* 510 U.S. 471 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Free Speech Coalition, Inc. v. Shurtleff*, 2007 WL 922247 (D. Utah 2007) . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,3,4,5,7, 16,19,23,25,26,27,28,29,30,31,32,33,34

*Frisby v. Schultz*, 487 U.S. 474 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28,32

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88 (1992).. . . . . . . . . . . . . . . . . . . . . . . 8,9

*Ginsberg v. New York*, 390 U.S. 636 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11,32

*Gitlow v. New York*, 268 U.S. 652 (1925)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Gordon v. Impulse Marketing Group, Inc.*, 375 F. Supp. 2d 1040 (E.D. Wash. 2005) . . . . . . . 11

*Gregory v. Ashcroft*, 501 U.S. 452 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Hill v. Colorado*, 530 U.S. 703 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26,28

*Holmes Group, Inc. v. Vornado Air Ciculation Sys., Inc.*, 535 U.S. 826 (2002) . . . . . . . . . . . . 12

*Hubbard v. United States*, 514 U.S. 695 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Hughes v. Oklahoma*, 441 U.S. 322 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333 (1977) . . . . . . . . . . . . . . 22

*Huron Portland Cement Co. v. Detroit,* 362 U.S. 440 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Lewis v. BT Investment Managers, Inc.,* 447 U.S. 27 (1980) . . . . . . . . . . . . . . . . . . . . . . . 20,22

*Maryland v. Louisiana*, 451 U.S. 725 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,7

*Mainstream Marketing Servs., Inc. v. FTC*, 358 F.3d 1228 (10th Cir. 2004) . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27,28,29,30,31,32,33,34

*McCulloch v. Maryland*, 4 Wheat. 316 L.Ed. 579 (1819) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Medtronic Inc. v. Lohr*, 518 U.S. 470 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,8,10

*National Coalition of Prayer, Inc. v. Carter*, 455 F.3d 783 (7th Cir. 2006) . . . . . . . 27,29,30,32,34

*Northeast Bancorp., Inc. v. Bd. of Governors*, 472 U.S. 159 (1985) . . . . . . . . . . . . . . . . . . . . . 19

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998) . . . . . . . . . . . . . . . . . . . . . . . . 12

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Peters v. Union Pac. R.R.,* 80 F.3d 257 (8th Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Provo City Corp. v. Willden*, 768 P.2d 455, n.2 (Utah 1989) . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Prudential Ins. Co. v. Benjamin*, 328 U.S. 408 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Quill Corp. v. North Dakota*, 504 U.S. 298 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Reno v. ACLU,* 521 U.S. 844 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Retail Clerks v. Schermerhorn*, 375 U.S. 96 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Rowan v. United States Post Office*, 397 U.S. 728 (1970) . . . . . . . . . . . . . . 27,28,29,30,32,33,34

*Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Sea Air Shuttle Corp. v. Virgin Islands Port Authority,* 800 F.Supp. 293 (D.Vi.1992) . . . . . . . 23

*Skull Valley Band of Goshute Indians v. Nielson*, 376 F.3d 1223 (10th Cir. 2004) . . . . . . . . . . 6

*Society of Sparationists v. Pleasant Grove City*, 416 F.3d 1239 (10th Cir. 2005) . . . . . . . . . . . 3

*Southern Pacific Co. v. Arizona,* 325 U.S. 761 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*State v. Archuleta*, 857 P.2d 234 (Utah 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184 (2002) . . . . . . . . . . . . . . . . . . . . . . . . 12

*Troxel v. Granville*, 530 U.S. 57 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11,32

*United States v. American Library Association*, 539 U.S. 194 (2003) . . . . . . . . . . . . . . . . . . . 32

*United States v. Edge Broad. Co.,* 509 U.S. 418 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Playboy Entm't Group, Inc.,* 529 U.S. 803 (2000) . . . . . . . . . . . . . . . . . . . . 31,33

*United States v. Public Utils. Comm'n of Cal.*, 345 U.S. 295 (1953) . . . . . . . . . . . . . . . . . . . . 4

*United States v. Williams*, 376 F.3d 1049 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton,* 536 U.S. 150 (2002).. . . . 33

*Welton v. Missouri*, 91 U.S. 347 (1876). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*White v. Massachusetts Council of Construction Employers, Inc.,* 460 U.S. 204 (1983) . . . . . . 23

*White Buffalo Ventures LLC v. Univ. of Texas*, 420 F.3d 366 (5th Cir. 2005) . . . . . . . . . 9,23,24

*William v. Taylor*, 529 U.S. 420, 431 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**Statutes, Rules and Other Authorities**

12 U.S.C. §§ 1715z-1718(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

15 U.S.C. §§ 7701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

15 U.S.C. §§ 7703 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

15 U.S.C. §§ 7704. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

15 U.S.C. §§ 7707. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

29 U.S.C. §§ 1144 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

A.R.S. § 13-3506.01 (Arizona 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

"CAN-SPAM" 15 § 7701 . . . . . . . . . . . . . . . . . . . . 3,4,7,8,11,12,13,14,15,16,17,19,22,23,24,25

Collins Denny, Jr., The Growth and Development of the Police Power of the State, 20 Mich. L. Rev. 173, 173 (1921) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Fed. R. Civ. P. 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,3

John W. Burgess, Political Science and Comparative Constitutional Law: Sovereignty and Liberty 213 (Boston, Ginn & Co. 1890) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Randy E. Barnett, The Proper Scope of the Police Power, 79 Notre Dame L. Rev. 429 (2004) . 10

*Oxford English Dictionary* (Oxford University Press, 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

The Federalist No. 42 (James Madison) (Clinton Rossiter ed., 1961) . . . . . . . . . . . . . . . . . . . . . 21

The Federalist No. 45 (James Madison) (Clinton Rossiter ed., 1961) . . . . . . . . . . . . . . . . . . 6,10

U.S. Const. art. I, § 8, cl. 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

U.S. Const. art. VI, cl. 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

U.S. Const. amend. X . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Utah's Child Protection Registry Act ("CPR Act") Utah Code Ann. § 13-39-101 . . . . . . . . . . . .
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,10,12,,13,15,16,17,18,19,22,24,25,26,32,33,34

Utah Code Ann. § 13-39-102(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Utah Code Ann. § 13-39-202(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Utah Code Ann. § 13-39-301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Utah Code Ann. § 76-9-201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Utah Code Ann. § 76-10-1201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Utah Code Ann. § 76-10-1206 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Walter Wheeler Cook, What is Police Power?, 7 Colum. L. Rev. 322, 322 (1907) . . . . . . . . 9

*Webster's Ninth New Collegiate Dictionary* 1132 (Merriam-Webster, Inc. 1987) . . . . . . . . . . 14

Pursuant to Rule 12(c) of the Federal Rules of Civil Procedure and DUCivR. 7-1, Defendant Unspam Registry Services, Inc. ("Unspam"), by and through its undersigned Counsel, submits this brief in support of its Motion for Judgment on the Pleadings, and respectfully requests that the Court enter judgment for Unspam against Plaintiff Free Speech Coalition ("FSC" or "Plaintiff").

## **INTRODUCTION**

Originally brought on November 17, 2005, this case essentially has been inactive for approximately a year.  Aside from service of a Second Set of Interrogatories, which Unspam considered irrelevant to the case but answered and has served on Plaintiff, the case has been dormant since the Court denied Plaintiff's motion for preliminary injunction in a Memorandum Decision and Order which found, among other things, that it was unlikely that Plaintiff would prevail on the merits of any of its claims.  *See Free Speech Coalition, Inc. v. Shurtleff*, 2007 WL 922247 (D. Utah 2007) (Kimball, J.).  FSC did not appeal that ruling to the Tenth Circuit Court of Appeals.  Based on that ruling, and the caselaw generally which entirely supports the Court's earlier legal conclusions, Unspam files its Motion for Judgment on the Pleadings, supported by this memorandum, on all counts contained in the Second Amended Complaint (Doc. # 19; hereinafter "Complaint").

In its broad terms, this case involves the simple question of whether the State of Utah may use its legitimate police powers to allow Utah parents to prevent unwanted communications from entering their homes, if parents themselves deem these communications to have an undesirable effect on their children and want to keep these communications from their children and out of their homes. In its specific terms presented before the Court, this case involves a challenge to the constitutional

1

validity of Utah's Child Protection Registry Act ("CPR Act"), Utah Code Ann. § 13-39-101 *et seq.*
For the purposes of considering the present motion, the most relevant portion of the CPR Act is
Section 13-39-202(1), which provides that absent consent of an adult who controls communications
sent to a minor through a "contact point,"[1] as that term is defined in the statute:

> (1)  A person may not send, cause to be sent, or conspire with a third party to send
> a communication to a contact point or domain that has been registered for more
> than 30 calendar days . . . if the communication:
>
>> (a) has the primary purpose of advertising or promoting a product or
>> service that a minor is prohibited from purchasing; or
>>
>> (b) contains or has the primary purpose of advertising or promoting material
>> that is harmful to minors, as defined in Section 76-10-1201.[2]

Utah Code Ann. § 13-39-202(1).  FSC asserts that this provision runs awry of the Supremacy Clause
of the United States Constitution and is therefore preempted by federal law, violates the dormant
Commerce clause to the United States Constitution, and is inconsistent with the guarantees to
Freedom of Expression found in the constitutions of the Unites States and the State of Utah.
Unspam contends that this and the other provisions of the CPR Act are valid and perfectly

---

[1] A "contact point" is defined by the statute, subject to certain qualifications, as "an email
address," "an instant message identity," "a mobile or other telephone number," "a facsimile
number," or "an electronic address."  Utah Code Ann. § 13-39-102(1).

[2] Under that provision:
> "Harmful to minors" means that quality of any description or representation,
> in whatsoever form, of nudity, sexual conduct, sexual excitement, or
> sadomasochistic abuse when it:
> (a)  taken as a whole, appeals to the prurient interest in sex of minors;
> (b) is patently offensive to prevailing standards in the adult community as a
> whole with respect to what is suitable material for minors; and
> (c) taken as a whole, does not have serious value for minors.  Serious value
> includes only serious literary, artistic, political or scientific value for
> minors.

Utah Code Ann. § 76-10-1201(4).

2

constitutional exercises of Utah's police powers which, for the most part, merely support many already existing Utah laws, such as the state's statute barring the sale of pornography to minors. *See* Utah Code Ann. § 76-10-1206 (2005).

Therefore, this case turns on the strict legal questions of whether the express provisions of the CPR Act violate the Supremacy Clause, the dormant Commerce Clause, the First Amendment of the United States Constitution, or the free speech protections enshrined in the Utah Constitution. As demonstrated below, they do not, Plaintiff's case can be adjudicated on its pleadings, and this Court should therefore grant Unspam judgment on the pleadings.

## STANDARD OF REVIEW

"A decision . . . granting a defense motion for judgment on the pleadings . . . [uses] the same standard of review applicable to a Rule 12(b)(6) motion." *Society of Sparationists v. Pleasant Grove City*, 416 F.3d 1239, 1240 (10th Cir. 2005) (internal citations and quotations omitted). "As with a ruling under Fed. R. Civ. P. 12(b)(6), … dismissal [is granted] only when it appears that the plaintiff can prove no set of facts in support of the claims that would entitle the plaintiff to relief." *Id*. (internal citations and quotations omitted).

## ARGUMENT

A.   **Preemption under Section 7707 of the CAN-SPAM Act**

Plaintiff's First Cause of Action alleges that the CPR Act runs afoul of the Supremacy Clause of the United States Constitution on the theory that the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 ("CAN-SPAM"), 15 § 7701 *et seq*., preempts the CPR Act.  Complaint ¶¶ 20-24.  As the Court's earlier decision recognized, this claim has no

3

merit, and the law plainly demonstrates that Plaintiff's allegations fail as pled.  *See Shurtleff*, 2007WL922247, at *10 ("Plaintiff has . . . failed to meet its burden of demonstrating success on the merits with respect to preemption.").

Regarding canons of statutory interpretation, which could aid the Court in its preemption analysis, the Supreme Court has been consistent in focusing on the language of the statute in question itself, often admonishing that "a historical analysis normally provides less guidance to a statute's meaning than its final text." *Hubbard v. United States*, 514 U.S. 695, 703 (1995).  "In analyzing a statute, we begin by examining the text . . . not by 'psychoanalyzing those who enacted it . . . .'" *Carter v. United States*, 530 U.S. 255, 271 (2000).  "[O]ur inquiry focuses on an analysis of the textual product of Congress' efforts, not on speculation as to the internal the internal thought processes of its Members." *Id*. at 272.[3]  "The law as passed is the will of the majority of both houses, and the only mode in which that will is spoken is in the act itself. . . ." *Aldridge v. Williams*, 44 U.S. (3 How.) 9, 24 (1845) (emphasis added).

---

[3] Justice Jackson was pointedly insightful in addressing this topic, as he warned that interpreting a statute through reconstructing Congress's supposed intent carried with it the danger of causing the judiciary to overstep its constitutional authority and engage in *de facto* legislation:

> I should concur in this result more readily if the Court could reach it by analysis of the statute instead of by psychoanalysis of Congress.  When we decide statements of . . . what Congress probably had in mind, we must put ourselves in the place of a majority of Congressmen and act according to the impression we think this history should have made on them.  Never having been a Congressman, I am handicapped in that weird endeavor.  That process seems to me not the interpretation of a statute but creation of a statute.

*United States v. Public Utils. Comm'n of Cal.*, 345 U.S. 295, 319 (1953) (Jackson, J. concurring).

As the language of CAN-SPAM itself evidences, Congress's basic purpose in enacting the legislation was to create a national standard for rules governing the structure of commercial email messages and the techniques used to send them.  *See* generally 15 U.S.C. §§ 7701, 7703, 7704.  Among other things, the statute prohibits commercial emailers from sending deceptive or misleading information using deceptive subject headings, requires them to include return addresses in their email messages, and prohibits them from sending emails to a recipient after that recipient had indicated that they do not wish to receive email messages from the sender.  *See* 15 U.S.C. § 7704(a); *see also Shurtleff*, 2007WL922947, at *7.  The statute additionally requires businesses sending sexually explicit materials to provide labels warning of such content.  *See id*. § 7704(d).  Especially relevant to the preemption question before the Court, it also expressly acknowledges that federal legislation alone cannot be viewed as, and is not in fact, the sole solution to the problems created by the rapid growth and abuse of spam.  *See* 15 U.S.C. § 7701(5), (12); *see also Shurtleff*, 2007WL922947, at *7.  Moreover, CAN-SPAM plainly states that its preemption provision applies only to "any statute, regulation, or rule of a State or political subdivision of a State that expressly regulates the use of electronic mail to send commercial messages" but not to "State laws that are not specific to electronic mail" or those involving "computer crimes."  15 U.S.C. § 7707(b)(1), (b)(2)(A), (b)(2)(B).

Laws that implicate but are not specific to email are legion, as are those involving computer crimes.  Thus, as discussed below, Plaintiff's claims regarding preemption, which depend upon an assumption of federal exclusivity of legal jurisdiction, are incorrect in light of what CAN-SPAM expressly covers, and Plaintiff's broad allegations regarding the inability of states to

combat pornographic email solicitations are belied by the plain language of CAN-SPAM's preemption language.

          1.     <u>Relevant Legal Standards and Canons for Preemption Analysis</u>

The Supremacy Clause of the United States Constitution provides: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary Notwithstanding."  U.S. Const. art. VI, cl. 2. In plain terms, the Supremacy Clause proscribes a constitutional choice of law rule that gives federal law precedence over conflicting state law and is the source of the preemption doctrine. Under that doctrine, state laws that conflict with or are contrary to federal law are nullities.  *See Cipolone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992).  Federal common law has recognized three distinct types of preemption: express, implied and conflict.  *See, e.g.*, *Skull Valley Band of Goshute Indians v. Nielson*, 376 F.3d 1223, 1239-40 (10th Cir. 2004) (discussing three types of preemption).

It has long been axiomatic that preemption‐4101‐4101 analysis starts "with the basic assumption that Congress did not intend to displace state law." *Bldg. and Constr. Trades Council v. Associated Builders and Contractors,* 507 U.S. 218, 224 (1993) (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)).  For instance, precision in determining the contours of federal power was, of course, a main preoccupation of the drafters of the Constitution, and one reason why they insisted on both enumerated federal legislative authority and upon the reservation of all other legal authority to the state or the people.  U.S. Const. amend. X; *see also generally* The Federalist No. 45 (James Madison) (Clinton Rossiter ed., 1961) (discussing

enumerated federal power, Supremacy Clause and separation of power between federal and state government).  In keeping with this foundational premise, over time the Supreme Court has reflected that the power to supplant state law is "an extraordinary power in a federalist system." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).  Because such power is capable of upsetting the usual balance of federal and state powers, the Court has assumed that Congress does not exercise that power lightly.  *See id.*  "Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law."  *Maryland*, 451 U.S. at 746.  The Court has observed that interpretation of a preemption provision does not occur in a "contextual vacuum," ;7535;7535but must be informed by the presumption against preemption unless clearly and manifestly indicated by Congress.  *Medtronic Inc. v. Lohr*, 518 U.S. 470, 485 (1996).

Here, only express preemption is at issue, because CAN-SPAM plainly states that its preemption provision applies to "any statute, regulation, or rule of a State or political subdivision of a State that expressly regulates the use of electronic mail to send commercial messages" but not to "State laws that are not specific to electronic mail."  15 U.S.C. § 7707(b)(1), (b)(2)(A). The Court in its earlier order correctly recognized that only express preemption is at issue in this case because CAN-SPAM contains this and other express preemption provisions.  *See Shurtleff*, 2007WL922947, at *7.  This Court's first step in express preemption analysis therefore is to ascertain whether the express preemption provision at issue is "a 'reliable indicum of congressional intent with respect to state authority.'"  *Cipolone*, 505 U.S. at 517 (quoting *Malone v. White Motor Corp.*, 435 U.S. 497, 484 (1978)).  "[T]he pre-emptive language of [CAN-SPAM] means that [the Court] need not go beyond that language to determine whether Congress intended [CAN-SPAM] to pre-empt at least some state law[;] yet the Court] must nonetheless

7

'identify the domain expressly pre-empted.'" *Medtronic*, 518 U.S at 484 (quoting *Cipolone*, 505 U.S. 517). In this case, the express preemption provision of CAN-SPAM is the reliable indicator of Congress's intent because it directly and specifically describes the areas of state authority superseded by CAN-SPAM. Accordingly, an implied preemption analysis is unnecessary because "*Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted*." *Cipolone*, 505 U.S. at 517 (emphasis added). In conducting this analysis, the Court begins with CAN-SPAM's text as "informed by two presumptions about the nature of pre-emption." *Id*. at 484-85 (citing *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 111 (1992).

The first of these presumptions is that the "purpose of Congress is the ultimate touchstone" in every preemption case. *Retail Clerks v. Schermerhorn*, 375 U.S. 96, 103 (1963); *see also, e.g.*, *Cipolone*, 505 U.S. at 516. Relevant to this inquiry is "the structure and purpose of the statute as a whole, as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumer, and the law." *Medtronic*, 518 U.S. at 486 (internal citation and quotation omitted). However, regarding the legal significance such material, this Court should follow the admonition of the Supreme Court, because CAN-SPAM itself is explicit about its preemptive effect on State law:

> Application of "broad purposes" of legislation at the expense of specific provisions ignores the complexity of problems Congress is called upon to address and the dynamics of legislative action. Congress may be unanimous in its intent to stamp out some vague social or economic evil; however, because its Members may differ sharply on the means for effectuating that intent, the final language of the legislation may reflect hard-fought compromises. Invocation of the "plain purpose" of legislation at the expense of the terms of the statute itself takes no

> account of the processes of compromise and, in the end, prevents the effectuation of congressional intent.

*Bd. of Governors, Fed. Reserve Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 373-74 (1986).  This is merely to reiterate the obvious: that "[i]f the statute contains an express preemption clause, then the statutory construction should center on its plain meaning as the best evidence of Congress's preemptive intent." *Peters v. Union Pac. R.R.,* 80 F.3d 257, 261 (8th Cir.1996).  As the Supreme Court has put it: "Congress' intent, of course, is primarily discerned from the language of the pre-emption statute and the 'statutory framework' surrounding it."  *Medtronic*, 518 U.S. at 486 (quoting *Gade*, 505 U.S. at 111).  This insistence on precision in determining Congress's express intent reflects the fact that preemption analysis is not "[a] freewheeling judicial inquiry into whether a state statute is in tension with federal objectives."  *Gade,* 505 U.S. at 111 (KENNEDY, J., concurring in part and concurring in judgment).  Indeed, as one court of appeals recently put it, "Supremacy Clause analysis is classic 'tie goes to the state' jurisprudence."  *White Buffalo Ventures LLC v. Univ. of Texas*, 420 F.3d 366, 370 (5th Cir. 2005) (upholding state email regulation against claim that it was preempted by CAN-SPAM).

The second presumption is of particular relevance to this case because Plaintiff contends that the CPR's civil and criminal provisions regarding public welfare, a general province of state police powers,[4] are preempted by a federal statute.  "It is fundamental in our federal structure that

---

[4] The police power reserved to the states historically has been acknowledged to be difficult to define.  *See, e.g.*, 1 John W. Burgess, Political Science and Comparative Constitutional Law: Sovereignty and Liberty 213 (Boston, Ginn & Co. 1890) ("I can find no satisfactory definition of the phrase, 'police power,' in the decisions of the Supreme Court itself.");  Walter Wheeler Cook, What is Police Power?, 7 Colum. L. Rev. 322, 322 (1907) ("No phrase is more frequently used and at the same time less understood. . . .");  Collins Denny, Jr., The Growth and Development of the Police Power of the State, 20 Mich. L. Rev. 173, 173 (1921) ("The police power is one of the most difficult phrases of or law to understand, and it is even more difficult

States have vast residual powers.  Those powers, unless constrained or displaced by the existence

of federal authority or by proper federal enactments, are often exercised in concurrence with

those of the National Government."  *McCulloch v. Maryland*, 4 Wheat. 316 L.Ed. 579 (1819).

> Because the States are independent sovereigns in our federal system, we have long
> presumed that Congress does not cavalierly pre-empt state-law causes of action.
> In all pre-emption cases, and particularly in those Congress has legislated in a
> field which the states have traditionally occupied, we start with the assumption
> that the historic police powers of the States were not to be superceded by the
> Federal Act unless that was the clear and manifest purpose of Congress. . . .   That
> approach is consistent with both federalism concerns and the historic primacy of
> state regulation of matters of health and safety.

*Medtronic*, 518 U.S. at 485 (internal citations and quotations omitted).  State police powers have

traditionally been considered to extend to, at a minimum, issues of public health, safety and

morals; they also inherently entail both criminal and regulatory methods for fostering those aims.

*See, e.g.*, *id.*; *Beer Co. v. Massachusetts*, 97 U.S. 25, 33 (1878); *see also Barnes v. Glen Theater*

*Inc.*, 501 U.S. 560, 569 (1998) (holding that the traditional police power of the states in public

health, safety and morals permits regulation of nude dancing).

---

to define it and place it within any bounds.").  As usual, however, James Madison's observations
are instructive on the subject of the balance of sovereign authority in our federal system:

> The powers delegated by the proposed Constitution to the federal government are
> few and defined.  Those which are to remain in the State governments are
> numerous and indefinite.  The former will be exercised principally on external
> objects, as war, peace, negotiation, and foreign commerce; with which last the
> power of taxation will, for the most part, be connected.  The *powers reserved to
> the states* will extend to all objects which, in the ordinary course of affairs,
> *concern the lives, liberties, and properties of the people, and the internal order,
> improvement, and prosperity of the State*.

The Federalist No. 45, at 292-93 (James Madison) (Clinton Rossiter ed., 1961) (emphasis
added).  These powers have generally been recognized to allow criminal sanctions as well as
civil provisions to ensure the health, safety and general welfare of state citizens. *See, e.g.*, Randy
E. Barnett, The Proper Scope of the Police Power, 79 Notre Dame L. Rev. 429, 475-495 (2004).

The CPR Act is a presumptively proper exercise of Utah's police powers, as the Supreme Court has acknowledged the state's interest in safeguarding parents' right "to authority in their own household to direct the rearing of their children [which] is basic in the structure of society." *Ginsberg v. New York*, 390 U.S. 636, 639 (1968).  Indeed, the Court has called the "liberty interest . . . of parents in the care, custody, and control of their children . . . perhaps the oldest recognized by this Court."  *Troxel v. Granville*, 530 U.S. 57, 65 (2000).  Because parents play a vital role in the "upbringing of their minor children for civic duty, they are entitled to the support of laws designed to assist them in this regard."  *Ginsberg*, 390 U.S. at 639.  For this reason, the Court should strongly presume that CAN-SPAM was not intended to preempt state laws fostering such compelling state interests, which are the very basis of the CPR Act**.**

This Court should also accord the presumption against preemption great weight because the policy of doing so properly compels Congress's exercise of authority to be exacting, as it requires Congress to speak precisely in express preemption provisions.  Such a requirement enhances legislative accountability, the foundation of our democratic system of governance. Further, attributing great weight to the presumption against preemption does not at all emasculate federal legislative power, for as the Supreme Court has long recognized: "Congress can speak with drastic clarity whenever it chooses to assure full federal authority, completely displacing the States."  *Bethlehem Steel Co. v. N.Y. State Labor Relations Bd.*, 330 U.S. 767, 780 (1947). Consequent with these considerations of federalism, the presumption against preemption requires clear and manifest evidence of congressional intent to displace place the police powers that have historically inhered to the State.  *See Cipolone*, 505 U.S. at 516.  Neither Congress's purpose in

enacting CAN-SPAM, nor, as more specifically described below, CAN-SPAM's express preemption provision, evidence such clear and manifest intent.

>        2.        The CPR Act is Not Preempted Under CAN-SPAM's Plain Terms

Where, as here, Congress expressly indicates its intent to displace state law with uniform federal regulation, courts "must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." *Engine Mfrs. Ass'n v. South Coast Air Quality Dist.*, 541 U.S. 246, 252 (2004).  It is fundamental that "it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Cooper Indus. v. Aviall Servs.*, 125 S.Ct. 577 584 (2004) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998)).  "Our consideration of the issue [of a statute's meaning] is guided first and foremost by the words of the [statute] itself." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 196 (2002).  "Our task here is not to determine what would further Congress's goal . . ., but to determine what the words of the statute must fairly be understood to mean." *Holmes Group, Inc. v. Vornado Air Ciculation Sys., Inc.*, 535 U.S. 826, 833 (2002).

CAN-SPAM's provisions on preemption and its exceptions to preemption are clear on their face, and demonstrate that the CPR Act is not preempted by the federal statute.  The preemption provisions provide:

> (b)  **State law**
>> (1) **In general**
>> This chapter supersedes any statute, regulation, or rule of a State or political subdivision of State that expressly regulates the use of electronic mail to send commercial messages, except to the extent that any such statute, regulation, or rule prohibits falsity or deception in any portion of a commercial electronic mail message or information attached thereto.
>> (2)  **State law not specific to electronic mail**

> This chapter shall not be construed to preempt the applicability of—
> (A)   State laws that are not specific to electronic mail, including State trespass, contract, or tort law; or
> (B)   other State laws to the extent that those laws relate to acts of fraud or computer crime.

15 U.S.C. § 7707(b)(1), (2).  Plaintiff previously argued that the first provision, § 7707(b)(1), applies to the CPR Act and is dispositive of the preemption issue.  *See Shurtleff*, 2007WL922247, at *7.  This is not the case.  The CPR Act is covered by the express terms of § 7707(b)(2) and is not preempted both because the CPR act is not a law specific to electronic mail, under 15 U.S.C. § 7707(b)(2)(A), and because it is a law relating to computer crime, under 15 U.S.C. § 7707(b)(2)(B).  A plain reading of the statute leads to this conclusion and, consequently, demonstrates that the CPR Act is not preempted by CAN-SPAM.

It is the simple fact that on its face, the CPR Act is not an act that is "specific to electronic mail."  Rather, the CPR Act regulates "contact points," which are defined by the statute, subject to certain qualifications, as "an email address," "an instant message identity," "a mobile or other telephone number," "a facsimile number," or "an electronic address."  Utah Code Ann. § 13-39-102(1).  As this list suggests, while the CPR Act expressly mentions "an email address," its regulations are not "specific to" merely email addresses.  The CPR Act thus, under both its plain terms and CAN-SPAM's, falls within the preemption exception of 15 U.S.C. § 7707(b)(2)(A).

In the absence of a particular definition, a federal court must "construe a statutory term in accordance with its ordinary or natural meaning" and in doing so, as a practical matter, look to general dictionary definitions to determine plain meaning.  *FDIC v. Meyer*, 510 U.S. 471, 477 (1994); *accord William v. Taylor*, 529 U.S. 420, 431 (2000); *United States v. Williams*, 376 F.3d 1049, 1053 (10th Cir. 2004).  The terms "Specific" or "specific to" are commonly considered to

13

denote something which, as the same linguistic root would suggest, is *specified* by its relation to another single thing or definite entity.  The adjective "specific," according to the *Oxford English Dictionary*, means "**Peculiar to**, characteristic of, something."  *The Compact Edition of the Oxford English Diction, Complete Text Reproduced Micrographically*, vol. 2, 2949 (Oxford University Press, 1971).  Similarly, the *Online Concise Oxford English Dictionary* defines the adjective "specific to" as "belonging or **relating uniquely to**."  Webster's defines "specific" as "sharing or being those properties of something that allow it to be referred to *a particular category*," *Webster's Ninth New Collegiate Dictionary* 1132 (Merriam-Webster, Inc. 1987).  As these definitions suggest, in their plain usage "specific" or "specific to" mean that one thing is singularly related to a given thing.  As such, the CPR Act is no more "specific to" electronic mail, as it is to an instant message identity, a mobile or other telephone number, a facsimile number, or an electronic address.  It is specific to none, as it relates to and encompasses all "contact points" enumerated in its provisions.  Had Congress wanted preempt every statute that simply *mentioned* email or purported to regulate email among other things, it easily could have, in exacting terms.  It did not.  And perhaps for good reason, as doing so would have caused the preemption of numerous state statutes around the country which mention email among many things covered by their terms.[5]   Rather, in simple

---

[5] For instance, any of the myriad statutes, too numerous to helpfully name for the Court, referencing email would be preempted under Plaintiff's interpretation of CAN-SPAM. *See, e.g.*, *A.R.S. § 13-3506.01* (Arizona 2001) (prohibiting knowingly sending via the internet obscene material to minors).  For instance, Utah's anti-electronic communication harassment statute provides:

> (1) As used in this section:
> (a) "Electronic communication" means any communication
> by electronic, electro-mechanical, or electro-optical communication device
> for the transmission and reception of audio, image, or text but does not
> include broadcast transmissions or similar communications that are not

terms, Congress in its wisdom sought to exempt statutes just like the CPR Act, which are not

"specific to" email, as they regulate email as one among many modes of communication.

The CPR Act is also expressly exempted from CAN-SPAM's general preemption section

because, as the Court has previously found, it is a law "relat[ing] to "computer crime[,]" under 15

---

> targeted at any specific individual.
>   (b) "Electronic communication device" includes telephone, facsimile, electronic mail, or pager.
> (2) A person is guilty of electronic communication harassment and  subject to prosecution in  the jurisdiction where the communication originated or was received if with intent to annoy, alarm,  intimidate, offend, abuse, threaten, harass, frighten, or disrupt the electronic communications of another, the person:
>   (a) (i) makes repeated contact by means of electronic communications, whether or not a conversation ensues; or
>       (ii) after the recipient has requested or informed the person not to contact the recipient, and the person repeatedly or continuously:
>         (A) contacts the electronic communication device of the recipient; or
>         (B) causes an electronic communication device of the recipient to ring or to receive other notification of attempted contact by means of electronic communication;
>   (b) makes contact by means of electronic communication and insults, taunts, or challenges the recipient of the communication or  any person at the receiving location in a manner likely to provoke a violent or disorderly response;
>   (c) makes contact by means of electronic communication and threatens to inflict injury, physical harm, or damage to any person  or the property of any person; or
>   (d) causes disruption, jamming, or overload of an electronic communication system through excessive message traffic or other means utilizing an electronic communication device.
> (3) Electronic communication harassment is a class B misdemeanor.
> (4) This section does not create any civil cause of action based on. electronic communications made for legitimate business purposes.

U.C.A. § 76-9-201 (emphasis provided). It is not surprising that Congress would exempt such statutes from CAN-SPAM's preemptive effects since they too would not be considered laws not *specific* to email.  If Congress had not, a legion of state statutes mentioning email or electronic mail, which a simple Westlaw search puts at 2,839 statutes, would arguably be preempted by CAN-SPAM.

U.S.C. § 7707(b)(2)(B).  *See Shurtleff*, 2007WL922247, at *9.   The CPR Act expressly makes a violation of the Act a computer crime under Utah law.  U.C.A. § 13-39-301.  Under its general police powers Utah has the right to define the nature and manner in which it defines and penalizes computer crimes.  The United States Congress has no authority, enumerated or implied, to dictate to the several states what the states readily have the authority to do under their own police powers, or define what constitutes a particular crime under state law.  Congress similarly has no authority under which it can dictate to the states the method and manner in which the several states's criminal statutes are described, enacted and codified.  CAN-SPAM does not say that computer crimes are exempted from preemption provided they fall into some traditional notion of computer crimes as they were codified at the time of its enactment.  CAN-SPAM does not define the term "computer crime" at all.  Rather, in plain and simple language, it exempts state laws that pertain to computer crimes.  The CPR Act itself defines a violation of Sections 13-39-301(1) and (2) as computer crimes and they are therefore exempt under the statute's clear terms.  Utah Code Ann. § 13-39-301.  Had Congress wanted to specify certain versions of computer crimes for exemption, it certainly could have.  The Supreme Court recognizes the legitimacy of such results: "Although we recognize the potential for harsh results in some cases, we are not free to rewrite the statute that Congress enacted.  'When the statute's language is plain, the function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'"  *Dodd v. United States*, 125 U.S. 2478, 2483 (2005) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U.S. 1, 6 (2000)).  Enforcing an express exemption according to its plain terms is hardly absurd, and therefore this court should also find that the CPR Act is not preempted for the separate and independent reason that it plainly falls within CAN-SPAM's computer crime exemption.

16

In sum, "Congress can speak with drastic clarity whenever it chooses to assure full federal authority, completely displacing the States." *Bethlehem Steel*, 330 U.S. at 780.  Congress has shown itself perfectly capable of expressing unambiguously the parameters of complete preemption of state law, rules, and regulations by federal statutes.  For example, the Domestic Housing and International Recovery and Recovery and Financial Stability Act, 12 U.S.C. §§ 1715z-1718(e), states Congress's specific preemptive intent as follows: "Mortgages insured pursuant to this section . . . shall not be subject to any State constitution, statute, court decree, common law rule, or public policy."  Congress has at its fingertips similar boilerplate statutory language for use whenever it intends complete preemption.  For instance, the preemption language of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1144, is equally sweeping and explicit: it preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in [the Act]," and defines "State law" to include "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." 29 U.S.C. § 1144(a), (c)(1).  If Congress had intended to completely displace all state regulation of commercial email, it certainly could have done so easily in CAN-SPAM, by not exempting laws that are not specific to email, or those which relate to fraud or computer crime.  But Congress expressly did not do so.  The CPR Act is a valid exercise of Utah's police power which is entitled to full presumptions against preemption.  Because on its plain terms CAN-SPAM does not preempt the CPR Act, Unspam is entitled to a judgment on the pleadings with respect to Plaintiff's First Cause of Action, its preemption claim.

### B.     The CPR Act is Not Void for Violation of the Dormant Commerce Clause of the United States Constitution

Plaintiff's Second Cause of Action, under the dormant Commerce Clause, essentially reiterates its claims for federal preemption of the CPR Act in Plaintiff's First Cause of Action. FSC's preemption claim rested on an assertion that a federal statute superceded the CPR Act thereby expressly rendering it unconstitutional under the Supremacy Clause.  Its dormant Commerce Clause claim basically asserts a logically identical claim, albeit one that rests on the CPR Act's alleged unconstitutionality because it runs awry of an implied power of Congress, under which the States are prohibited from taking certain actions deemed by the judiciary to intrude on Congress's power to regulate interstate commerce, even absent congressional action.  *See, e.g.*, *Cooley v. Board of Wardens*, 12 How. 299, 13 L.Ed. 996 (1852).  Unlike federal preemption litigation, which is prompted by explicit federal legislation, the dormant Commerce Clause essentially empowers the federal judiciary in the first instance: what occasions analysis under it is congressional silence followed by state regulation, topped off by litigation.

None of Plaintiff's dormant Commerce Clause allegations rest on the theory that the CPR Act on its face discriminates between in-state and out of state senders, as it does not.  Rather, Plaintiff's claims rest on four theories.  Three of these claims advance the view that the CPR Act is a *per se* violation of the dormant commerce clause because, Plaintiff alleges: a) it burdens commerce occurring wholly outside Utah; b) it discriminates between merchants based on the connection or lack of connection to Utah; and c) it creates inconsistent and potentially conflicting systems of regulation.  *See* Complaint at ¶¶ 25-28, 30-31.  Plaintiff also alleges that even if the CPR Act does not constitute a *per se* violation, it is nevertheless void under the so-called *Pike*-test, derived from

*Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), in that the burdens the CPR Act place on interstate commerce allegedly outweigh any local benefit gained by the regulatory system.  *See id.* at ¶ 29. Although the Court has also found that Plaintiff's dormant Commerce Clause claim fail under the traditional *Pike* balancing tests upon which Plaintiff places its entire Second Cause of Action, *see Shurtleff*, 2007WL922247, at *12, the *Pike* balancing test is not relevant to the disposition of FSC's dormant Commerce Clause claim because Congress has expressly consented to certain state regulation in the area of email, as previously discussed, in the express preemption exceptions contained in CAN-SPAM.  For this reason, Unspam is entitled to a judgment on the pleadings on Plaintiff's Second Cause of Action.

Here, as this Court has already recognized, FSC's claim under the dormant Commerce Clause fatally "suffers an analytical flaw because Congress has expressly allowed states to regulate commercial email, as discussed in the preceding preemption analysis." *Shurtleff*, 2007WL 922247, at *11.  In doing so, Congress was hardly silent regarding its role in regulating email commerce and, as discussed in the previous section, expressly allowed the states to legislate in related areas under CAN-SPAM's preemption exemptions, and also expressly recognized that Congress could not properly regulate the area alone.  As such, Congress authorized and consented to allow ancillary regulation by States and other entities.  Thus, even assuming for the sake of argument that the dormant Commerce Clause would otherwise invalidate the CPR Act, Congress's design in CAN-SPAM evidences its consent to exempt such regulation from running awry of the Commerce Clause. "When Congress so chooses, state actions that it plainly authorizes are invulnerable to constitutional attack under the commerce clause." *Northeast Bancorp., Inc. v. Bd. of Governors*, 472 U.S. 159, 174 (1985); *see also e.g., Prudential Ins. Co. v. Benjamin*, 328 U.S. 408 (1946) (similarly recognizing

19

this limitation on the effects of the dormant Commerce Clause).  This rule regarding congressional

consent is dispositive of the question of whether the dormant Commerce Clause renders the CPR Act

unconstitutional.

     1.      <u>Relevant Legal Standards and Policy Principles for Dormant Commerce Clause Analysis</u>

The Commerce Clause to the United States Constitution provides that "[t]he Congress shall

have Power . . . [t]o regulate Commerce . . . among the several States."  U.S. Const. art. I, § 8, cl. 3.

Even though it is clearly phrased as a grant of enumerated regulatory authority to Congress, the

Commerce Clause has been understood to have a dormant or negative aspect that denies the States

the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce.

*See, e.g.*, *Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992); *Welton v. Missouri*, 91 U.S. 347 (1876).

"Although the Clause thus speaks in terms of powers bestowed upon Congress, the Court long has

recognized that it also limits the power of the States to erect barriers against interstate trade." *Lewis*

*v. BT Investment Managers, Inc.,* 447 U.S. 27, 35 (1980).  This is to say that in its simplest terms,

the dormant Commerce Clause primarily is concerned not with incidental effects on interstate

commerce caused by legitimate State regulation, but with State regulation that is motivated by a

State's economic concern for itself at the expense of the rest of the Union.

While it is not in the text of the constitution,[6] and it is often criticized as a judicial creation,[7] the Court has also recognized the dormant Commerce Clause as Justices reason that the Framers granted Congress plenary authority over interstate commerce in the "conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Hughes v. Oklahoma*, 441 U.S. 322, 325-26 (1979). Such an observation is likely true as a matter of first principles, as James Madison observed that such Balkanization would "nourish unceasing animosities, and not improbably terminate in serious interruptions of the public tranquility." The Federalist 42 (Madison), at 268. Justice Jackson famously echoed this sentiment when commenting on this economic rationale:

> This principle that our economic unit is the Nation, which alone has the gamut of powers necessary to control of the economy, including the vital power of erecting customs barriers against foreign competition, has as its corollary that the states are not separable economic units. . . . Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the nation. . . .

Thus it has always been envisioned that the policy behind the dormant Commerce Clause is a constitutional check on State protectionism and economic self interest; the dormant Commerce

---

[6] Excepting only the Chief Justice and Justice Alito, every sitting Supreme Court Justice has made this observation. *See Quill Corp. v. North Dakota*, 504 U.S. 298, 309 (1992) (Stevens, J., writing for a unanimous court) (recognizing that the Commerce Clause "says nothing about the protection of interstate commerce in the absence of any action by Congress"); *Wyoming*, 502 U.S. at 461-62 (Scalia, J., joined by Rehnquist, C.J., and Thomas, J., dissenting) (describing the "negative Commerce Clause" as "nontextual"); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 797, n.12 (1995) (Stevens, J., joined by Kennedy, Souter, Ginsburg, Breyer, J.J.) ("[T]he Constitution is clearly silent on the subject of state legislation that discriminates against interstate commerce.").

[7] *See, e.g.*, *C&A Carbone, Inc. v. Clarkstown*, 511 U.S. 383, 401 (1994) (O'Connor, J., concurring in judgment) ("The scope of the dormant Commerce Clause is a judicial creation").

21

Clause recognizes a "national 'common market'" which the States cannot destroy by advancing their own *economic* interests at the expense of the nation. *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 350 (1977).

Yet, any limitation imposed by the Commerce Clause on state regulatory power "is by no means absolute," and the Supreme Court has continually and constantly stated that "the States retain authority under their general police powers to regulate matters of 'legitimate local concern,' even though interstate commerce may be affected." *Lewis,* 447 U.S. at 36. Thus, it is important to note that the Supreme Court has long recognized that the negative or dormant aspect of the Commerce Clause was not intended "to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country." *Huron Portland Cement Co. v. Detroit,* 362 U.S. 440, 443-444 (1960). In sum, dormant Commerce Clause jurisprudence, as with Supremacy Clause jurisprudence, recognizes and incorporates some deference to the traditional police powers of the several states.

2.   The CPR Act is Not Void Under the Dormant Commerce Clause Because Congress Has Explicitly Recognized the Validity of Such Acts in CAN-SPAM

As described above, by enacting CAN-SPAM Congress clearly and expressly stated that it alone cannot regulate the area except by those express provisions covered by CAN-SPAM itself. CAN-SPAM effectively constructed a floor of regulation upon which states were explicitly encouraged to build. The CPR Act cannot violate the dormant Commerce Clause because it and similar non-congressional acts, which have effects on internet email, are specifically recognized as legitimate and constitutional by Congress.[8]

---

[8] Other courts have recognized that Congress intended to leave room to the states to regulate in the area of email. *See, e.g., Gordon v. Impulse Marketing Group, Inc.,* 375 F.

"When Congress so chooses, state actions that it plainly authorizes are invulnerable to constitutional attack under the commerce clause." *Northeast Bancorp*, 472 U.S. at 174. "Moreover, the States retain authority under their general police powers to regulate matters of legitimate local concern, even though interstate commerce may be affected." *Shurtleff*, 2007WL922247, at *11 (quoting *Lewis*, 447 U.S. at 36) (internal quotation marks omitted). "The limitations on state authority created by the Commerce Clause cannot be ascertained without reference to the relevant federal law" and if authorized by federal law cannot run afoul of the Commerce Clause." *Norfolk Southern Corporation v. Oberly,* 822 F.2d 388, 393 (3d Cir.1987) (upholding Delaware's coastal zone statute which banned product transfer facilities from operating on the Delaware coast). The Supreme Court has long observed with respect to the application of the dormant Commerce Clause, that when "state or local government action is specifically authorized by Congress, it is not subject to the Commerce Clause even if it interferes with interstate commerce." *White v. Massachusetts Council of Construction Employers, Inc.,* 460 U.S. 204, 213 (1983) (emphasis added) (holding that Commerce Clause did not prevent City of Boston from giving effect to Mayor's Executive Order requiring all construction projects funded with municipal monies to be performed by a workforce at least half of whom were bona fide residents of Boston), *citing Southern Pacific Co. v. Arizona,* 325 U.S. 761, 769 (1945); *see also Sea Air Shuttle Corp. v. Virgin Islands Port Authority,* 800 F.Supp. 293, 304-05 (D.Vi.1992) (port authority's actions were authorized under the proprietary powers exception to Airline Deregulation Act preemption and therefore did not violate the dormant

---

Supp. 2d 1040, 1045–46 (E.D. Wash. 2005) (recognizing that after CAN-SPAM Congress specifically authorized states to continue to regulate in the area of email); *see also White Buffalo*, 420 F.3d at 371–73 (5th Cir. 2005).

Commerce Clause); *Bowers v. NCAA*, 151 F.Supp.2d 526, 539 (D. N.J. 2001) (finding similar implicit authorization by federal statute).

As discussed above, Congress in CAN-SPAM authorized state laws which had regulatory effect that was not "specific to electronic mail" and state laws that "relate to" "computer crime." 15 U.S.C. § 7707(b)(2). Congress further noted that while national standards for regulation under the precise terms and limited regulation of CAN-SPAM itself were necessary, Congress could not entirely hope to engage in the necessary and proper regulation alone. It therefore expressly noted that: "The problems associated with the rapid growth and abuse of unsolicited commercial electronic mail cannot be solved by Federal legislation alone. The development and adoption of technological approaches and the pursuit of cooperative efforts with other countries will be necessary as well." 15 U.S.C. § 7701(12). To this end, Congress not only authorized the preemption exemptions covering the CPR Act discussed above, it also allowed regulation by Internet access services in an express preemption exception:

> Nothing in this chapter shall be construed to have any effect on the lawfulness or unlawfulness, under any other provision of law, of the adoption, implementation, or enforcement by a provider of Internet access service of a policy of declining to transmit, route, relay, handle, or store certain types of electronic mail messages.

15 U.S.C. § 7707(c). At least one federal court of appeals has found that this provision allowed a state university operated system to block email solicitations sent to users on its server. *See White Buffalo Ventures, LLC v University of Texas at Austin*, 420 F.3d 366, 372-73 (5th Cir. 2005). All of these provisions evidence that Congress expected other actors to take actions which effected email directly or in an ancillary manner, and, as such, the CPR Act is not unconstitutional under the dormant Commerce Clause. As this Court observed previously in analyzing the dormant Commerce

Clause claim in this case: "'[w]hile perhaps interesting from an academic point of view, it is clear that Congress itself, in enacting CAN-SPAM, specifically reserved to the States . . . authority to regulate certain aspects of Internet activity.   . . .   [I]f Congress itself was satisfied that supplementary state legislation would impose no undue burden on interstate commerce, this Court can hardly presume to tell Congress it is wrong.'" *Shurtleff*, 2007W922247, at *11 (quoting *Beyond Systems, Inc. v. Keynetics, Inc.*, 422 F.Supp.2d 523, 532, 535 (D. Md. 2006) (internal citations omitted).  Because Congress has expressly allowed states to regulate in this area, FSC's Second Cause of Action based on the dormant Commerce Clause also fails as a matter of law, and Unspam is entitled to a judgment on the pleadings regarding that claim.

### C.    The CPR Act Does Not Violate the Protections Accorded Free Speech by the United States and Utah Constitutions

The First Amendment to the United States Constitution provides that:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or of the right of the people to peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. Const. amend. I.  Since *Gitlow v. New York*, 268 U.S. 652, 625 (1925), the Supreme Court has held that the liberty interest in expression which the First Amendment guarantees against abridgment by the federal government is within the liberty safeguarded  by the Due Process Clause of the Fourteenth Amendment from invasion by state action.  Yet, as is discussed in detail below, and dispositive of the issue now before this Court, the Supreme Court has repeated recognized the right of citizens to avoid unwanted communication, even in cases involving core political speech, as part of their broader right to be let alone.  *See, e.g.*, *Hill v. Colorado*, 530 U.S. 703, 716-17 (2000) (quoting *Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting)).

Although not all of them are contained in the pleadings, in prior papers before the Court Plaintiff advanced nine separate, though somewhat repetitive, free speech arguments in contending the unconstitutionality of the CPR Act: 1) that it is an unconstitutional prior restraint on core political expression; 2) that its chilling effect violates the expressive privacy rights of it and its members; 3) that it imposes an unconstitutional burden on protected expression; 4) that it is a content-based statute which makes it unconstitutional; 5) that it is unconstitutionally vague under First Amendment principles; 6) that it violates minors' so-called right to receive communications of public interest; 7) that it impermissibly regulates advertising for the purpose of prohibiting minors from purchase from what they cannot purchase lawfully; 8) that it, relatedly, cannot ban advertising of products just because minors cannot legally purchase them; and 9) that it violates the provisions of Article I, Section 15 of the Utah Constitution.  *See generally* Pl's Mem. in Supp. of Mot. for Prelim. Inj. (Doc. # 28); Pl's Reply to Response to Mot. for Prelim. Inj. (Doc. # 75).  In the Complaint, FSC brings three speech-related causes of action: "Third Cause of Action (Prior Restraint)", "Fourth Cause of Action (Expressive Privacy)", and "Fifth Cause of Action (Burden on Protected Expression")".  *See* Complaint ¶¶ 32-47.  Generously and broadly read, Plaintiff's Second Amended Complaint may encompass seven of the nine arguments cited above—all but arguments 5 and 6.  However, Plaintiff's pleadings nowhere raise a vagueness challenge to the CPR, either under the First or Fourteenth Amendments to the United States Constitution.  Although the Court addressed vagueness issues raised by Plaintiff and Amici in Support of Plaintiff, *see Shurtleff*, 2007WL922247, at *16, and Unspam also responded to these arguments regarding vagueness, *see* Unspam's Brief in Opposition to Plaintiff's Motion for Preliminary Injunction (Doc. #70) at 54-55, Plaintiff has not pled a vagueness claim and therefore Unspam is entitled to a judgment on the pleadings regarding

any vagueness argument Plaintiff attempts to advance in this action.[9]   Finally, all of Plaintiff's remaining arguments under the First Amendment fail, not only as a matter of logic, but also, more pertinently, as a matter of law, and therefore Unspam is entitled to a judgment on the pleadings regarding Plaintiff's Third, Fourth and Fifth causes of action.

Arguments 1, 2, 3, 4, 7, and 8 enumerated above, are disposed of under binding Supreme Court and Tenth Circuit precedent, and are also persuasively and conclusively discussed in a recent Seventh Circuit opinion.  *See Rowan v. United States Post Office*, 397 U.S. 728 (1970); *Mainstream Marketing Servs., Inc. v. FTC*, 358 F.3d 1228 (10th Cir. 2004); *National Coalition of Prayer, Inc. v. Carter*, 455 F.3d 783 (7th Cir. 2006).   These decisions stand for the proposition that when the government empowers citizens to do so, the First Amendment is not violated when citizens control what speech enters their private domains.   The dispositive nature of these opinions to the claims in this case is addressed in the following section; thereafter a short final section demonstrates that any remaining issue raised in Plaintiff's claim under the Utah Constitution is similarly without merit.

1.   Plaintiff's First Amendment Arguments Fail Because the CPR Act Merely Fosters Utah Citizen's Right to Avoid Unwanted Communication

Plaintiff contends that the CPR Act is a content-based regulation of protected expression that should be subjected to strict scrutiny, under the rule of such cases such as *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115 (1989).  The line federal cases, of which *Sable* is a part, do not govern the First Amendment questions before this Court.   Supreme Court jurisprudence, and decisions from other federal courts, have repeatedly recognized that, even in cases involving core political speech,

---

[9] Even if the Court were to find that FSC has pled a vagueness claim, Unspam would be entitled to a judgment on the pleadings for the reasons articulated in the Court's earlier orders.  *See Shurtleff*, 2007WL922247, at *16.

citizens have the right to prohibit speech from their private domains, and that states may enact legislation to enable this right without running awry of the First Amendment. *See, e.g.*, *Hill*, 530 U.S. at 716-17. As the Supreme Court held in *Frisby v. Schultz*, "the State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society." 487 U.S. 474, 484 (1988) (quoting *Carey v. Brown,* 447 U.S. 455, 471 (1980)). The Court in *Frisby* continued:

> One important aspect of residential privacy is protection of the unwilling listener. . . . [A] special benefit of the privacy all citizens enjoy within their own walls, *which the State may legislate to protect*, is an ability to avoid intrusions. Thus, we have repeatedly held that individuals are not required to welcome unwanted speech into their own homes and that the government may protect this freedom.

*Id.* at 484-85 (emphasis added) (citations omitted). The Supreme Court has stated this in unequivocal terms. *See FCC v. Pacifica Found.,* 438 U.S. 726, 748 (1978) ("[I]n the privacy of the home . . . the individual's right to be left alone plainly outweighs the First Amendment rights of an intruder."). Prior restraint analysis similarly is not applicable in such a situation because, as the Tenth Circuit observed: "Like the do-not-mail regulation approved in *Rowan,* the national do-not-call registry **does not itself prohibit any speech**. Instead, it merely 'permits a citizen to erect a wall . . . that no advertiser may penetrate without his acquiescence.'" *Mainstream Marketing*, 358 F.3d at 1243 (emphasis added) (quoting *Rowan,* 397 U.S. at 738). This Court has recognized the same principle. *See Shurtleff*, 2007 WL 922247, at *13. The same logic goes to defeat Plaintiff's claim of a "chilling effect." There is no chilling effect of speech in a system that, in itself, does not prohibit speech, but rather fosters privacy and the interest of citizens in avoiding unwanted communications. *See id*. at *14.

In large measure, this is because the Supreme Court, the Tenth Circuit and other federal

courts, as well as the Court in this case, have recognized that when a government sponsored "opt-in" regulation allows citizens to keep out unwanted communication, the First Amendment is not offended and strict scrutiny need not be applied.  *See Rowan*, 397 U.S. 728; *Mainstream Marketing*, 358 F.3d 1228; *National Coalition of Prayer*, 455 F.3d 783; *Shurtleff*, 2007WL922247, at *14-16.

        For instance, in *Rowan* the Supreme Court reviewed a law that allowed customers of the U.S. Postal Service to prohibit delivery of sales literature for items "which the addressee in his sole discretion believes to be erotically arousing or sexually provocative."  The Court upheld the statute, citing the need for a person to be safe from any unwanted message—even a "valid message"—in his or her own home. Because the homeowner had to take an affirmative act to prohibit mailings, the Court wrote:

> [I]t seems to us that a mailer's right to communicate must stop at the mailbox of the unreceptive addressee. . . .  To hold less would tend to license a form of trespass and would make hardly more sense than to say that a radio or television viewer may not twist the dial to cut off an offensive or boring communication and thus bar its entering his home. Nothing in the Constitution compels us to listen to or view any unwanted communication, *whatever its merit*. . . .

*Rowan,* 397 U.S. at 736-37 (emphasis added). The *Rowan* Court went on to state, "In effect, Congress has erected a wall—or more accurately permits a citizen to erect a wall—that no advertiser may penetrate without his acquiescence. . . . [T]he citizen cannot be put to the burden of determining on repeated occasions whether the offending mailer has altered its material so as to make it acceptable." *Id.* at 738.  Most tellingly, the Court directly held, "*We therefore categorically reject the argument that a vendor has a right under the Constitution or otherwise to send unwanted material into the home of another. . . .  [N]o one has a right to press even 'good' ideas* on an unwilling recipient." *Id.* (emphasis added).   Under *Rowan* which makes the citizens' right an

29

absolute rule, Unspam is entitled to a judgment on the pleadings on Plaintiff's First Amendment claims. This rule applies to state sponsored programs as well as programs federally initiated. *See, e.g.*, *National Coalition of Prayer*, 455 F.3d at 787-89 (applying *Rowan* analysis to Indiana opt-in program).

Yet, it must be acknowledged, that not all courts applying *Rowan* have followed its absolute dictates in such stark terms. Evaluating similar opt-in programs, the Tenth and Seventh Circuits similarly upheld such programs, but using a balancing test heavily—which is in accord with *Rowan*—weighted toward a citizen's right to restrict speech from his or her home. Dealing with speech usually accorded strict scrutiny protection, the Seventh Circuit in *National Coalition of Prayer*, held that "because of the 'opt in' nature of the [Indiana] Act [at issue], we need only determine that the State's interest in maintaining residential privacy for . . . citizens outweighs the speaker's right to communicate his or her message into private homes." 455 F.3d at 787.[10] The Tenth Circuit in *Mainstream Marketing,* applied the commercial speech test from *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980), but applying the principles of *Rowan*, similarly found that the opt-in features of the national do-not-call registry easily made the act at issue pass First Amendment scrutiny. 358 F.3d 1237-1246. This Court earlier followed this analysis in evaluating the issue on Plaintiff's motion for preliminary injunction. *Shurtleff*, 2007WL922247, at *15.

---

[10] The Seventh Circuit seemed to suggest that such a balancing test was a mere formality since: "Once we have decided to apply the *Rowan* analysis, it would seem the case is resolved, since the Supreme Court has already made clear that citizens in their own homes have a stronger interest in being free from unwanted communication than a speaker has in speaking in a manner that invades residential privacy." *National Coalition of Prayer*, 455 F.3d at 790.

Of special relevance to this case due to the nature of the "contact points" regulated in the CPR Act, in analyzing the opt-in regulation at issue in *Mainstream Marketing*, the Tenth Circuit found that: "The idea that an opt-in regulation is less restrictive than a direct prohibition of speech applies not only to traditional door-to-door solicitation, but also to regulations seeking to protect the privacy of the home from unwanted intrusions *via telephone*, television, *or the Internet*." 358 F.3d at 1243 (emphasis added) (citing *United States v. Playboy Entm't Group, Inc.,* 529 U.S. 803, 815 (2000); *Reno v. ACLU,* 521 U.S. 844, 860, (1997)). Although Unspam asserts that the dictates of *Rowan* mandate dismissal of Plaintiff's claims under that case's plain command, it addresses the *Central Hudson* factors out of an abundance of caution.

> A.   The CPR Act is Constitutional Under the Tenth Circuit's Jurisprudence Applying the *Central Hudson* test to Opt-In Regulatory Systems

This Court has already recognized that the CPR Act passes the *Central Hudson* test, following Tenth Circuit jurisprudence. *Shurtleff*, 2007WL922247, at *15. In *Mainstream Marketing*, the Tenth Circuit reviewed the national do-not-call registry and summarized the *Central Hudson* test:

> *Central Hudson* established a three-part test governing First Amendment challenges to regulations restricting non-misleading commercial speech that relates to lawful activity. First, the government must assert a substantial interest to be achieved by the regulation. Second, the regulation must directly advance that governmental interest, meaning that it must do more than provide only ineffective or remote support for the government's purpose. Third, although the regulation need not be the least restrictive measure available, it must be narrowly tailored not to restrict more speech than necessary. Together, these final two factors require that there be a reasonable fit between the government's objectives and the means it chooses to accomplish those ends.

358 F.3d at 1237 (internal quotations and citations omitted).

Regarding the first two factors as applied to this case, the CPR Act advances three substantial governmental interests. First, it advances Utah's interest in protecting minors in their home from pornography and solicitations regarding other materials potentially harmful to them, when and if their parents so choose. The Supreme Court has recognized a state interest in such protections as a substantial government interest on numerous occasions. *See, e.g.*, *United States v. American Library Association*, 539 U.S. 194, 200 (2003) (recognizing state interest of protecting children from pornography); *Ginsburg*, 390 U.S. at 636-39 (recognizing interest in both safeguarding minors from pornography and parent's right to safeguard children from such things in their own home); *Pacifica Found.*, 438 U.S. at 726, 749-50 (upholding restriction on indecent speech easily accessible by minors). Here, Utah merely exercises its police power to allow parents to advance these interests in the domestic realm. Second, the CPR Act advances Utah's interest in fostering the rights of parents to raise their children in a manner they see fit, which, as mentioned before, has long been recognized by the Supreme Court as an important right deserving of governmental support. *See, e.g.*, *Ginsberg*, 390 U.S. at 639; *Troxel*, 530 U.S. at 65. Finally, as also mentioned above, the CPR Act furthers Utah's substantial interest in fostering privacy of the home from unwanted communications. *See Frisby*, 487 U.S. at 484; *Rowan*, 397 U.S. at 728; *Mainstream Marketing*, 358 F.3d at 1237-38; *National Coalition of Prayer*, 455 F.3d at 789-91.

Regarding the third *Central Hudson* requirement that the CPR Act be tailored and reasonably fit its goals, the constitutional analysis here does not require that the regulation meet its goals completely; it must only be designed to reduce its targeted problem. *See Mainstream Marketing*, 358 F.3d at 1238-41; *United States v. Edge Broad. Co.*, 509 U.S. 418, 423-24, 434-35 (1993); *Shurtleff*, 2007 WL 922247, at *15. The CPR Act certainly is designed to reduce the targeted

problem—prevent unwanted communication to communication devices in the homes of Utah families. Yet the CPR Act is certainly not the only option available to Utah families. Parents, if they so desire, can certainly take measures to avoid their children's public contact with legal pornography and advertising for things children cannot legally purchase. The methods of doing so are myriad and irrelevant to the consideration here. What is relevant is that the CPR Act is narrowly tailored through its opt-in feature, to prevent exactly what it is designed to prevent: unwanted speech from entering the home, or the private spaces of a cell phone or email in-boxes, of unwilling recipients. The Courts in *Rowan*, *Mainstream Marketing*, and *National Coalition of Prayer* found such opt-in programs entirely sufficient to meet the narrow tailoring requirement. 397 U.S. at 729-30; 358 F.3d at 1242-42; 455 F.3d at 790-92. The Supreme Court has found numerous times that opt-in features of regulation provide the requisite constitutional safeguard. *See, e.g.*, *Playboy Entm't Group, Inc.*, 529 U.S. at 815 (opt-in blocking of offensive programming "enables the Government to support parental authority without affecting the First Amendment interests of speakers and willing listeners...."); *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 153, 168-69 (2002). This Court has earlier concluded the same. *Shurtleff*, 2007 WL 922247, at *15. Because it only inhibits unwanted speech from entering the homes and private spaces of unwilling recipients, the CPR's Acts opt-in feature meets the final prong of the *Central Hudson test* and Unspam is entitled to a judgment on the pleadings regarding Plaintiff's First Amendment claims found in the third, fourth and fifth counts of Plaintiff's Second Amended Complaint.

2.       <u>Plaintiff's Remaining Speech Claim as also Fails as the CPR Act Does not Violate the Free Speech Protections of the Utah Constitution</u>

This Court has already rejected Plaintiff's possible arguments under Article I, Section 15 of the Utah Constitution. *Shurtleff*, 2007WL922247, at *17. Yet frankly, there are two cases in which the Utah Supreme Court observed that the free speech provision in the Utah Constitution "is somewhat broader than the federal clause," *Provo City Corp. v. Willden*, 768 P.2d 455, n.2 (Utah 1989), and that its protections somewhat greater, *State v. Archuleta*, 857 P.2d 234, 239-40 (Utah 1993). However, there is no Utah caselaw to support an argument that the federal principles addressed above are not otherwise dispositive under any claim Plaintiff might advance under the Utah Constitution. There is no caselaw treating the Utah Constitution which suggests that Utah would not be in complete accord with the federal principles discussed above. For this reason, to the extent that Plaintiff relies upon the Utah Constitution for its speech claim, they also fail, *Shurtleff*, 2007WL922247, at *17, and Unspam is entitled to a judgment on the pleadings on any claims Plaintiff seeks to advance under the Utah Constitution.

<u>CONCLUSION</u>

As demonstrated above, the CPR Act violates none of the constitutional provisions upon which Plaintiff's causes of action rely. It is a plainly constitutional exercise of Utah's police powers to foster the health, safety and morals of its citizens. Therefore, for reasons detailed in this memorandum, Defendant Unspam respectfully requests that this Court GRANT its Motion for Judgment on the Pleadings.

Dated this 3d day of September, 2009.

Respectfully submitted,

/s/ Parker Douglas
PARKER DOUGLAS
*Counsel for Defendant Unspam Registry Services, Inc*

## CERTIFICATE OF SERVICE

I hereby certify that on the 3d day of September, 2009, a true and correct copy of the foregoing was served via CM/ECF delivery to:

Jerome H. Mooney
Mooney Law Firm
50 W. Broadway, #100
Salt Lake City UT 84101

Ira P. Rothken
Rothkin Law Firm
1050 Norgate Drive, Ste. 520
San Rafael, CA 95903

Gregory A. Piccionelli
Robert A. Sarno
Piccionelli & Sarno
1925 Century Park East 2350
Los Angeles, CA 90067

Stephen F. Rohde
Rohde & Victoroff
1880 Century Park E, Ste. 411
Los Angeles, CA 90067

Thom D. Roberts, Assistant Attorney General
160 East 300 South, 5th Floor
P.O. Box 140859
Salt Lake City, Utah 84114-0857

Randy L. Dryer
Michael P. Petrogeorge
Parsons Behle & Latimer
201 South Main Street, Ste. 1800
Salt Lake City, Utah 84145

Dated this 3d day of September, 2009.

/s/ Parker Douglas
PARKER DOUGLAS
*Counsel for Defendant Unspam Registry Services, Inc.*